**NEW ORLEANS TYPOGRAPHICAL UNION NO. 17, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**E. P. RIVAS, INC., Appellant,**

v.

**NEW ORLEANS TYPOGRAPHICAL UNION NO. 17, Appellee.**

**Nos. 22881, 21113.**

United States Court of Appeals
Fifth Circuit.
Nov. 22, 1966.

Richard C. Keenan and Kullman & Lang, New Orleans, La., for E. P. Rivas, Inc.

Thomas J. Meunier, New Orleans, La., George Kaufmann, Washington, D. C., Dodd, Hirsch, Barker & Meunier, New Orleans, La., for New Orleans Typographical Union No. 17.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Solomon I. Hirsh, Atty., N. L. R. B., Washington, D. C., for N. L. R. B.

Before THORNBERRY and COLEMAN, Circuit Judges, and YOUNG, District Judge.

COLEMAN, Circuit Judge.

In these cases we are confronted with diametrically conflicting orders of a District Court and of the National Labor Relations Board arising out of a work assignment dispute between an employer on the one hand and two competing labor unions on the other. Except for parallel procedural events in Court and in Board, the controlling facts are substantially the same. This Court consolidated these cases on February 21, 1966 and they were argued together on October 24, 1966. They are factually and legally so completely overlapping and interlaced that they may best be decided in a consolidated opinion.

Number 22,881, New Orleans Typographical Union No. 17 v. National Labor Relations Board, was argued first. In this case, Local 17 of the named Union, hereinafter referred to as ITU, petitions for a review of an NLRB order. ITU was ordered to cease and desist from further violations of § 8(b) (4) (D) of the Labor Management Act by striking to protest an assignment of work by Rivas to Local 53, Amalgamated Lithographers Association (ALA).[1] The Board cross petitions for enforcement of its order.

Number 21,113, E. P. Rivas, Inc. v. New Orleans Typographical Union No. 17, argued second, is an appeal from the order of the District Court enforcing an arbiter's award of the same work to ITU.

In short, the Board orders that the work be assigned to ALA; the Court orders that it be assigned to ITU. For the reasons hereinafter appearing, we enforce the order of the Board and vacate and remand the order of the District Court.

---

1. 152 NLRB 587. The earlier Decision and Determination of Dispute is reported at 147 NLRB 191.

**758**

## I

### BACKGROUND FACTS

At the expense of extending what would even otherwise have to be a lengthy opinion, a complete description of the status of the parties and the nature of the owner's printing operation is essential. Printing in 1963 was not the elemental process known to the days of Ben Franklin. Moreover, the employer does both letter press and offset printing, at different locations. Three unions represent employees at one location while a fourth represents all employees at the other. Of course, only two unions, one at each plant, are involved in the present controversy.

Rivas, the employer, operates two commercial printing plants in New Orleans, one on Bienville Street and one on Chartres, both in the French Quarter, 18 or 20 blocks apart.

The pressroom in the Bienville Street plant employs the letter press method of printing by which raised metal type locked in a frame, is put on the letter press, inked, and then pressed against paper to produce printed materials.

Printing at the Chartres Street plant is done by the offset method. Camera-ready copy is photographed by a cameraman. The image on the resultant negative is burned onto a sensitized plate, called an offset plate, by an arc lamp. The unique feature of the offset plate is that only those portions of its surface burned with an image will hold ink; portions of the plate not burned with an image will repel ink. After ink is applied to the plate, the plate is pressed against a rubber blanket which receives the plate's ink image. The rubber blanket is in turn pressed against paper producing the final printed product.

Prior to April 1963, the date this controversy began, all "raw" copy from a customer was sent to the composing room at the Bienville Street plant, regardless of whether the material was ultimately to be printed by letter press at the Bienville Street plant or by offset at the Chartres Street plant. The raw copy would be "marked-up" by noting on the copy instructions as to type and size of type, and then would be given to a linotype machine operator who would set the type in molten metal. Lettering of headline size would be cast on a similar "hot metal" machine called a Ludlow. After type was cast it would be put, by line, into a frame called a "chase." If the copy was to be printed by letter press, the "chase" could be sent directly into the pressroom where it would be locked into a letter press and run off. If the copy was to be printed by the offset method, the "chase" would be put on a proof press and a "reproduction proof" would be run off. The "reproduction proof" would then be sent to the Chartres Street plant.

At the Bienville Street plant the employees in the composing room are represented by the ITU, the pressroom employees are represented by the Pressmen's Union, and the bookbindery employees are represented by the Bookbinders Union. All employees at the Chartres Street plant are represented by the ALA.

In a representative period prior to the installation of the photographic typesetter at the Chartres Street plant, almost all of the typesetting done by ITU members in the Bienville Street plant composing room was produced for use in letter press printing in that plant. Only 7.66 percent of work done by ITU members was "reproduction proof" work destined for offset printing at the Chartres Street plant. After the installation of a photographic typesetter at the Chartres Street plant in April, 1963, the Bienville Street plant composing room still devoted nearly 4 percent of its work to the preparation of reproduction proofs.

Both before and after the installation of the photographic typesetter at the Chartres Street plant, more than half of the offset work has been produced from copy that did not originate from the Bienville Street plant composing room. A customer would frequently bring in a form that he wanted reproduced; the cameraman at the Chartres Street plant

would simply photograph the form and use the resultant negative to make an offset plate. Similarly, a customer would often reorder copies of a form that the employer originally printed. In that case, the employer would merely take a copy of the original printing from his files, and have it photographed for the production of an offset plate. Occasionally, a file copy to be reproduced would need a minor correction, such as a change in an address on the letterhead. The new line would be set by the hot metal machine in the Bienville Street plant composing room and a reproduction proof of the line would be run. The new line would then be sent to the Chartres Street plant where it would be pasted over the old line by one of the lithographers. The corrected copy would then be photographed and an offset plate made. Prior to the introduction of the photographic typesetter at the Chartres Street plant, the remainder of the offset work was produced from reproduction proofs set and run off in the Bienville Street plant composing room. Illustrations, display line, etc., that needed to be added to the text appearing on a reproduction proof would be pasted onto the proofs by lithographers at the Chartres Street plant after the reproduction proofs were delivered to that plant.

## II

## THE ORIGINS OF THE LITIGATION

This brings us to the events which engendered this litigation.

In April, 1963, Rivas installed in the Chartres Street plant an ATF Photographic Tpyesetter, which we shall hereafter simply call the Typesetter, to be used solely to produce copy for the offset presses. The Typesetter not only has a keyboard unit but it also has a photographic unit. The keyboard is virtually the same as a standard typewriter keyboard. It is operated by normal "touch" typing. An operator on a standard linotype keyboard uses a particular 4-finger method of manipulating the keyboard rather than "touch" typing. When copy is typed on the Typesetter it produces coded tape. Simultaneonsly, the unit automatically types a regular typewritten page from which the typist may spot typing errors. If errors are present in any line, the line may be retyped. The unit "justifies" lines of type as they arise typed.

The tape is then taken from the keyboard unit and fed into the photographic unit where each character is photographed and transferred onto a sensitized paper contained in a canister on top of the photographic unit. Style and size of type are controlled by the insertion of an appropriate type disc in the front of the unit. The photographic unit also has a keyboard which is used for the limited purpose of making one-word corrections and justifying any lines improperly justified on the keyboard unit. After the characters are transferred onto the sensitized paper, the paper is taken from the canister and put into a small developing machine, which produces a printed page similar to a reproduction proof.

One person performs all three of the operations described above: typing on the keyboard unit, feeding the tape into the photographic unit, and putting the sensitized paper into the developer. If illustrations, display lines, borders, etc., need to be added to the proof, the proof is taken to a layout table where a paste-up man rules in the appropriate lines and pastes illustrations onto the proof with a special wax. The pasted-up proof is then photographed for the production of an offset plate.

While the Typesetter was being installed in the Chartres Street plant during the last week of April, 1963, Rivas hired two girls, both typists, to begin operational training. On April 26, the Employer and the ALA drew up a supplement to their existing contract specifying the wage rates and job specification for a Typesetter operation.

Rivas thus assigned the operation of the Typesetter to employees represented by the ALA. The Company and the ALA took the position that the Employer's contract with the ALA covered all work at the Chartres Street plant; that the

operator of the Typesetter performed photographic work similar to that performed by ALA members; and that the assignment to the ALA promoted the efficient operation of the Chartres Street plant.

ITU contended that the Employer's contract with the ALA pertained only to the operation of the offset presses; that the ITU contract covered typesetting work wherever performed; and that the Typesetter produces the same kind of proofs for offset printing that the ITU composing room employees had produced in the past.

In a meeting with the Employer on May 7, 1963, the ITU representatives claimed that their contract with the Employer covered the operation of the Typesetter and demanded that the work be assigned to employees represented by the ITU. When E. P. Rivas, Jr. (co-owner of the company) asserted, in reply, that the ALA contract also covered the operation of the Typesetter and that the Typesetter had been assigned to the ALA, one of the union representatives declared:

> "Well, we have ways of whipping fellows like you in line * * * you know we just spent five million dollars whipping the newspapers in New York in line and we can spend another million dollars on you all." [2]

2. The representative denied making this statement, but the Trial Examiner credited testimony that he did make it.

3. Section 8(b) (4) (D), 61 Stat. 136, 29 U.S.C. § 158(b) (4) (D), provides in pertinent part:
   (b) It shall be an unfair labor practice for a labor organization or its agents * * * (4) (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is— * * * (D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work.

The ITU representatives demanded that the dispute between the Employer and the ITU be submitted to arbitration under the ITU contract. Rivas refused.

## III

### CHRONOLOGIC SYNOPSIS OF THE MANEUVERS OF THE PARTIES, THE ACTIONS OF THE BOARD, AND THE ACTIONS OF THE DISTRICT COURT

As the record reflects, the parties to this dispute, with great energy, have fought for their respective positions in every possible forum. They kept the matter going before both the District Court and the Board at the same time. We note, however, that Rivas invoked the jurisdiction of the Board on June 26, 1963, and ITU began its proceedings in the District Court six days later. This duplicative tangle can hardly be separated without some systematic recitation of the various acts and maneuvers in a chronological manner. We shall here attempt it, as follows:

June 24, 1963. ITU calls strike against Rivas.

June 26, 1963. Rivas files charges with the National Labor Relations Board, alleging that ITU had violated § 8(b) (4) (D) [3] of the Act by striking to force a reassignment of the work.

Section 10(k), 29 U.S.C. § 160(k), provides:
Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4) (D) of section 158(b) of this title, the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of, the dispute. Upon compliance by the parties to the dispute with the decision of the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed.
The § 8(b) (4) (D) charge was as follows:
Since on or about June 24, 1963, New Orleans Typographical Union No. 17 has

July 2, 1963. ITU filed a § 301[4] suit in District Court, Action No. 13,595, to obtain an order commanding Rivas to arbitrate as required by contract. Rivas answered by contending that exclusive jurisdiction had become vested in the Board by virtue of the proceedings already pending there; that the jurisdiction of the District Court had been preempted.

August 8, 1963. On petition of NLRB, strike ended by temporary restraining order of the District Court, pending § 10(k) action of the Board.

August 8, 1963. On ITU Petition 13,595, Court orders Rivas to arbitrate the question of whether Employer's contract with ITU required the assignment of the work to ITU. *Rivas did not appeal.*

August 29, 1963. Section 10(k) hearing begins before NLRB Hearing Officer in New Orleans.

October 1, 1963. Dispute submitted to arbitrator on the record made before the NLRB Hearing Officer, ALA not a party to the arbitration.

November 14, 1963. Arbitrator decides the case favorably to ITU. Rivas refuses to comply.

December 9, 1963. Mandatory injunction by the District Court orders Rivas to comply with the arbitration award and to assign the work to ITU.

December 24, 1963. After oral argument, the United States Court of Appeals, Fifth Circuit, denies stay of the District Court order enforcing arbitration.

June 1, 1964. NLRB renders its Decision and Determination under § 10(k), holding that ALA was entitled to the assignment. Two members dissented.

September 30, 1964. United States Court of Appeals, Fifth Circuit, in view of the NLRB order of June 1, 1964, stays enforcement of the District Court order, pending Rivas' appeal.

July 16, 1964. ITU informs Board that it will not voluntarily comply with the order. Board then issued an unfair labor practice complaint.

November 16, 1964. Trial Examiner issued his decision against ITU.

May 14, 1965. Board affirms Trial Examiner's conclusion that ITU had violated § 8(b) (4) (D).

## IV

### REVIEW OF THE NLRB ORDER

The role of this Court in regard to this case 22,881, was made unmistakably plain by our decision in NLRB v. Local 991, ILA, 5 Cir., 1964, 332 F.2d 66.

---

picketed the premises of E. P. Rivas, Inc., at 615 Bienville and 2117 Chartres Sts. in the City of New Orleans for the purpose of forcing said employer to assign particular work to members of New Orleans Typographical Union No. 17 rather than to employees who are members of Local 53, Amalgamated Lithographers of America. There is no order or certification of the National Labor Relations Board determining the bargaining representative for employees performing the work in dispute. Both of the said labor organizations have contracts with E. P. Rivas, Inc. and both of the said labor organizations are claiming the work in question under their respective contracts and under their respective jurisdictions. The strike was called by New Orleans Typographical Union No. 17 after that union demanded arbitration of said jurisdictional dispute under its contract with the employer, without reference to the contract which the said employer has with Local No. 53, Amalgamated Lithographers of America.

E. P. Rivas, Inc. prays that (1) the National Labor Relations Board under Section 10(*l*) of the Act seek a Federal Court order enjoining New Orleans Typographical Union No. 17 from continuing this strike and (2) that the National Labor Relations Board forthwith decide this jurisdictional dispute.

4. 29 U.S.C.A. § 185; Act of June 23, 1947, c. 120, Title III, Section 301; 61 Stat. 156, providing:
"Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States, etc."

■■ The order of the Board is subject to review and this Court has both the power and the duty to determine whether there is substantial evidence to support it. The review must be exercised with this in mind: The National Labor Relations Board must determine the merits of underlying jurisdictional disputes by making an effective award of the disputed work. In doing this it must apply its experience in hearing and disposing of similar problems and its knowledge of standards generally used by arbitrators, unions, employers, joint boards, and others. Most significantly, we held in the cited case that in this kind of situation the Board exercises broad powers which are free of rigid standards in their application. See NLRB v. Radio & Television Broadcast Eng'rs Union, Local 1212 (often referred to as the CBS case), 364 U.S. 573, 81 S.Ct. 330, 5 L.Ed.2d 302 (1961).

Cases of this type are complicated by the absence of independent judicial review of jurisdictional dispute work assignments. The only stage at which the union can contest a work award is on review of an unfair labor practice order and if the work assignment order falls then the unfair labor practice order falls with it.

Petitioner raises only two issues:

(1) The Board's conclusion that the Union went on strike for a prohibited objective is not supported by substantial evidence on the record considered as a whole;

(2) The Board should have assigned the disputed work to the ITU rather than the ALA.

The first ground inspires no difficulty.

Obviously, ITU knew it could go to court under § 301 to enforce the arbitration agreement. If it struck in support of its claims to the work assignment, it would trigger § 10(k). What it did was to pursue both courses. We think the record shows that all the parties well knew what was permissible and what was prohibited.

We have already mentioned that an ITU representative told Rivas that the Union had ways of whipping fellows like him into line, that he knew they had just spent five million dollars whipping the newspapers in New York in line, and that another million dollars could be spent on him. The strike promptly followed.

■ There was no ambiguity in this language. These words, followed by action wholly consistent therewith, provide ample support in the evidence for a finding that coercive action to compel assignment of the work was an object of the strike, § 8(b) (4) (ii) (D).

Nor is it to be forgotten that ITU, knowing it did not have to strike to obtain arbitration, continued the strike for more than a month after it had filed its § 301 petition. The strike was halted only by court order, sought by the Board.

The second ground of ITU attack provokes more extended discussion, but like results.

ITU vigorously argues that the assignment of the work to ALA, rather than to ITU, is not supported by substantial evidence. It contends that the Board made numerous errors, any one of which would be sufficient basis for setting aside the decision. It says that the Board failed to give effect to any one of five factors regularly considered by it in making § 10(k) determinations, that each of the factors favored ITU. These factors were (1) contract rights; (2) skills to perform the work; (3) custom and practice in the industry; (4) trade jurisdiction; and (5) substitution of functions. In addition, it is charged that the case was decided in favor of ALA on the basis of factors which either did not support its claim or were entitled to little, if any weight.

The Board responds by contending primarily that its decision was neither arbitrary nor capricious and controverts at length each of the five factor arguments of ITU.

We can consider these contentions only in light of the rules already discussed,

particularly that there are no rigid standards of decision in § 10(k) determinations, leaving the Board to resolve each dispute on a case-by-case basis, weighing and balancing "all relevant factors in determining who is entitled to the work in dispute.

(1). *The contract and arbitration arguments.*

The Supreme Court said in CBS, supra, at 364 U.S. 579, 81 S.Ct. at 334, that the language of § 10(k) "indicates a congressional purpose to have the Board do something more than merely look at * * * a collective bargaining contract to determine whether one or the other union has a clearly defined statutory or contractual right to have the employees it represents perform certain work tasks." The Third Circuit has recently held that the contract is an element to be considered but it cannot be conclusive for there usually is more than one contract and it is the competing claims of right under separate contracts which give rise to the jurisdictional dispute. NLRB v. Local 1291, ILA, 3 Cir., 1965, 345 F.2d 4, cert. denied, 382 U.S. 891, 86 S.Ct. 183, 15 L.Ed.2d 149 (1965).

We are of the opinion, therefore, that the matter is not to be determined by the contract alone. And this is especially true under the facts of the instant case even though it be considered that the ITU contract covered the work, as apparently its language did.

ITU contends that the Board was required to follow the interpretation of the contract made by the arbitrator, citing the Steelworkers Trilogy.[5]

In Carey v. Westinghouse Elec. Corp., 375 U.S. 261, 84 S.Ct. 401, 11 L.Ed.2d 320 (1964), the Supreme Court held that the Board is not precluded from adjudicating unfair labor practice charges even though they might have been the subject of an arbitration proceeding and award, adding that "[s]hould

the Board disagree with the arbiter, * * * the Board's ruling would, of course, take precedence * * *"

If the Supreme Court had not spoken, the matter would nevertheless appear to be controlled by the express language of § 10(k). The Board is there told to defer to an arbitrator's award if "the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of, the dispute". No such direction is given as to any other circumstance. Rivas did not voluntarily submit to arbitration. It had to be compelled by injunction to arbitrate and again compelled to comply with the award. The one instance in which the statute directs the Board to defer to an award did not occur in the present case.

The matter does not end with the holdings that the language of the contract alone is not exclusively controlling and that the Board is not mandatorily required to follow the findings and award of the arbiter. What consideration and what weight did the Board give to the contracts of the parties? It found that the ALA contract did not cover typesetting and expressly denied any independent weight to the ALA supplemental contract entered into after the typesetter was installed. It admitted that "the language of the ITU contract may be construed to award the disputed work to the ITU, and has been so interpreted by an arbitrator". The pertinent provisions of the ITU contract are set out in the margin of the Board's Decision and we certainly agree that the ITU contract, considering the language only, could be so construed. The Board further found, however, and the evidence supports this finding, that the ITU contract had never been applied to employees working at the Chartres Street plant. One obvious answer to this is that prior to the arrival of the typesetter no type had been set

5.  United Steelworkers v. American Manufacturing Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403; United Steelworkers v. Warrior Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409; United Steelworkers v. Enterprise Wheel and Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424.

there. The evidence further shows, however, that the ITU contract covers certain other work, such as "stripping, proofing, waxing, paste makeup of types and hand lettering. ALA members at the Chartres Street plant had been doing this work, with no protest from ITU. The Board made no specific findings as to whether this omission constituted a waiver, unless it be implicit in the ultimate finding "that the factor of contract clauses favors neither Union". The dissenting Board Members pointed out that the ITU contract contains nothing which would indicate that it was intended to restrict its coverage to the Bienville Street plant. We agree, but we think in this kind of case language alone is not controlling particularly when we recall that the interpretation of contracts alone is not a function of the Board. Not only had there been no protest of the above work by ALA, but the Pressmen's contract at the Bienville Street plant covered offset printing and they had never claimed that work at the Chartres Street plant. This Court is thus left with the responsibility of deciding, as we did in NLRB v. Local 991, ILA, supra, whether the Board's decision can stand even if greater weight should have been accorded the ITU contract. We must decide the case on the record as a whole.

(2). *Skills to perform the work.*

Again, the Board found that this factor favored neither Union. At the outset of this opinion we described the differences between the typesetter, the linotype, and the operations thereof. In view of the facts there set forth we are unable to say that the Board findings in this regard are without substantial support in the evidence.

(3). *Custom and practice in the industry.*

The Board made no findings in this regard, saying that there was a paucity of evidence. The dissenting members made no comment on this factor. There were witnesses who testified that they knew of no combination plant where ALA and the ITU both have contracts in the same plant where ALA operates the keyboard. Conversely, there was no affirmative testimony as to what the custom is in such plants. The ITU witness also said he knew of no typesetter in the South being operated by ITU. We cannot see that this factor had to be considered.

(4). *Trade jurisdiction.*

The proof on this point, a very interesting and illuminative history of printing methods since 1720, contains nothing of real relevancy to the situation now before us.

(5). *Substitution of function.*

ITU says that "Unless there is some countervailing factor, also based on the national labor policy, the Board should be required to treat this factor as controlling". Congress, in § 10(k), did not prescribe standards which the Board is required to follow in determining these disputes. No court, so far as we know, has proposed to legislate in this field. Neither the Board or this Court can promulgate a rule such as here suggested.

Again, an examination of the facts set out at the beginning of this opinion reveals the difference in the two processes. It was there pointed out that before the typesetter was acquired 7.66 percent of the work done by ITU members at Bienville was destined for use at Chartres. Afterwards it was reduced to a little less than four percent. No ITU member had lost his job because of this change in operations. The typesetter does some things that the linotype does; it does others that the linotype cannot do. The differences support Board discretion, exercising broad powers, free of rigid standards.

The Board found that the factor of efficiency of operations supported ALA's claims to the work. The typesetter produces proof for use only on the offset press. Accordingly, the typesetter was located where the offset work was done, not 18 blocks away where the letter press work was done. Additionally, the Char-

tres Street plant employees, none represented by ITU, performed *all* of the other work necessary to the preparation of offset copy. It would have been quite illogical to have located the typesetter anywhere else. It can be said, with logic, that the typesetter was an integral part of the offset process. Had ITU members been assigned to the operation of the typesetter, it appears quite likely that the employer would have been contractually required to maintain a foreman solely to oversee the operation of the typesetter. Since all employees at the Chartres Street plant are represented by the ALA, assignment of the typesetter to members of that union frees its operators to do additional work as necessary or appropriate without incurring jurisdictional objections from ALA.

It is quite evident that if we were here dealing with rigid standards of determination and if this were a judicial proceeding controlled by such factors as the preponderance of the evidence, the ultimate decision might very easily have gone the other way. Remembering that Congress prescribed no § 10(k) standards, and that the Order must be reviewed on the record as a whole, can we confidently say that there was no substantial evidence to support what the Board did? ITU chose not to stand on its contractual rights as permitted by § 301. It deliberately brought itself within § 10(k). The Board was dealing with what appears to have been an unprecedented situation in the printing industry, involving two different processes in two different plants, although commonly owned.

Exact precedents are not to be expected for unprecedented situations.

The facts presently before us bear a strong resemblance to those in NLRB v. Local 991, ILA, supra. There, the Longshoremen picketed to compel an assignment of work, loading a company owned ship. The work had been assigned to company employees, members of another union. The employer's vessel was of a dual nature, carrying both dry and liquid cargo. Both liquid and dry cargo could be loaded simultaneously with one crew under one set of supervisory employees, and the intermittent nature of the work made it desirable to use plant employees. The Board decision was not unanimous but we enforced the order which awarded the work to company employees.

The opinion of the Court contained the following significant language:

"From this description of the operation, it is clear that even if the traditional jurisdictional claim of the ILA to the work of loading dry cargo aboard seagoing vessels were given extraordinary weight, the Board's resolution could nevertheless favor an award to the [company] employees."

The factual circumstances are also similar to those found in NLRB v. Local 825, International Union of Operating Eng'rs, 3 Cir., 1964, 326 F.2d 213, involving a dispute between two unions as to which was entitled to dig the holes for the installation of electric light line poles. Citing NLRB v. Radio & Television Broadcast Engr's Union, Local 1212, 364 U.S. 573, 81 S.Ct. 330, 5 L.Ed.2d 302 (1961) the Court said at 218: "it is the function of the Board and not this Court to consider the relevant factors and to weigh and evaluate the evidence adduced with respect to each. Since the Board has done that in this case and as its determination finds support in the record, we cannot say that it has failed to properly perform its statutory duty."

As herein demonstrated, the Board Decision is subject to attack in various phases and factors. Not all of these attacks are ill founded. Nevertheless, when we come to final judgment, which must be based on the record as a whole, in the light of all that has been said, we find ourselves unable to say with conviction that the result is lacking in support of substantial evidence.

On the petition for review, the Order of the Board stands. On the cross petition enforcement is granted.

## V.

## No. 21,113, RIVAS, INC. v. NEW ORLEANS TYPOGRAPHICAL UNION No. 17

■ Rivas, Inc., the appealing employer, resisting arbitration and the enforcement of the resulting award, says that the Labor Board's jurisdiction of this work assignment controversy was exclusive, that it preempted the power and jurisdiction conferred upon the District Court by § 301 of the Labor Management Relations Act.

The appellee Union counters that since Rivas pleaded preemption in opposition to the original order for arbitration and did not appeal it is now foreclosed, by *res adjudicata*, from claiming preemption here.

The appeal is prosecuted from the order enforcing the award. Without deciding whether the appeal would bring up all proceedings antecedent and incidental to the order of August 8, 1963, we are clearly of the view that *res adjudicata* is inapplicable. If the District Court was without jurisdiction to enter the first order then it could not be enforced in a subsequent order. Thus the question is preserved for determination here.

■ We are of the opinion that under the circumstances the pending Board proceedings did not preempt the § 301 jurisdiction of the Court.

In reaching this conclusion we are influenced by the reasoning of this Court in United Steelworkers v. American International Aluminum Corp., 334 F.2d 147 (1964), a §§ 8(a) (1), 8(a) (3) and 8(a) (5) case in which the Union had filed a § 301 complaint. The employer contended that the Board had exclusive jurisdiction. The District Court agreed and this Court reversed, saying, *inter alia:*

> This being an equitable proceeding, the trial court should retain jurisdiction over the cause so long as reasonably required. When the arbitrator's award has been rendered and perhaps the Labor Board decision announced, appealed, enforced, or vacated, the trial court can see on the basis of facts actually developed in each of the proceedings—not the mere allegations of lawyers—whether, and to what extent, there is any real conflict between private arbitration and public labor law enforcement. * * * So far as cost or inconvenience of producing like or similar evidence before the arbitrator is concerned, no policy defined in the Labor Act affords immunity to the parties to an arbitration agreement. * * * Actually, there are quite separate rights involving separate legal and factual issues. In the arbitration proceeding, the Union is seeking to enforce the *contractual* right of employees not to be discharged "unjustly." On the other hand, what is at issue in the Labor Board proceeding is the statutory rights of employees not to be discharged because of their union *membership* or because of anti-union discriminatory purposes on the employer's part. * * * In addition, although the charge sets the machinery in motion, once the complaint is issued the Board proceeding takes on a public character in which remedies are devised to vindicate the policies of the Labor Act, not afford private relief to employees. * * * Of course the law is neither so inflexible or unrealistic as to foreclose at this early developing stage the possibility that there may be circumstances in which the rightful, exclusive, primary jurisdiction of the Labor Board over a particular controversy forbids the commencement or continuation of a § 301 compelled arbitration.

Congress is vested with sole power over the jurisdiction of both the District Court and the Board. In statutes of equal dignity, it has conferred one power on the Courts and another on the Board. While it could have done so, Congress has not enacted that mere pendency of a charge which could lead to a § 10(k) determination shall stay the hand of the Court in a § 301 Petition. It can well be argued that if there is to be a § 10(k) determination then arbitration

can serve no useful purpose. Even so, in the case now before us there had been no § 10(k) hearing at the time the Court ordered Rivas to arbitrate. Section 10 (k) jurisdiction had not been settled, in that it had not been determined that forcing an assignment of the work was an object of the strike. The Union had contractual rights which the statute had provided the machinery to enforce. There could be no certainty at that stage that a valid of § 10(k) determination would ever be made. Assuming that in due course the Board would make one, it might have found there was no proscribed strike, or its assignment might be set aside on review. Rivas had a contractual duty to arbitrate and it had refused to do so. Its refusal was predicated on the argument that ALA would not be a party to the arbitration. It is by no means certain that ALA on contract alone was entitled to the work. If the § 10(k) Determination, above reviewed, had depended on contract alone it is by no means certain that it would have withstood review. It has not been made to appear that Congress intended that one of the contracting parties may evade or avoid his duty to arbitrate by filing a charge with the Board, even though the Union has begun a strike not yet found to be proscribed. The Panel of this Court which, after oral argument, denied stay of the Judgment enforcing the arbitrator's award must have had this in mind when it denied the stay.

It can well be argued that the proceedings were duplicative and might lead to conflict, as they did here. Even so, when the parties contracted to arbitrate they knew of § 10(k) and included no proviso that in the event of § 10(k) proceedings the duty to arbitrate should end, relieving them of duplication. If Rivas wished to avoid duplication all it had to do was to arbitrate. If the Union wished to avoid duplication all it had to do was to refrain from striking. Arbitration might well lead to a settlement, in which event the Board is directed by statute to dismiss the § 10(k) proceedings.

There was no strike in Carey v. Westinghouse, 375 U.S. 261, 84 S.Ct. 401, 11 L.Ed.2d 320 (1964) and it may well be that the absence of a strike was a critical factor in the decision. There is language so indicating, but the decision was necessarily limited to the facts and the Court recognized the high favor in which arbitration is held by saying that anterior to a strike the NLRB was without exclusive jurisdiction even if the dispute involved a work assignment. Arbitration was ordered. The Court did say that the superior *authority* [emphasis added] of the Board, not its procedures, may be invoked at any time. We think this means that filing a § 301 complaint would not preclude Board action.

The Board in this case did make a determination, but it was months after arbitration had been completed and enforced. When the Board did make a Determination this Court then stayed enforcement of the arbitration award, recognizing the precedence of the Determination, once it was made.

We are of the opinion, of course, that once the Determination is made and becomes final, then it takes precedence over the § 301 arbitration proceedings. When the Union struck to enforce the work assignment it removed the controversy from the field of private contractual rights into the higher ambit of public rights. When the Board acted, its order was entitled to precedence. Congress definitely intended that a § 10(k) Determination should be a permanent settlement of the dispute, NLRB v. Radio and Television Broadcast Engineers, 364 U.S. 573 at 577, 81 S.Ct. 330, 5 L.Ed.2d 302 (1961). The Judgment of the Court under § 301 must yield to the final Determination of the Board.

We, therefore, are of the opinion that the Judgment of the District Court should be vacated and remanded with directions to dissolve its mandatory injunction for the enforcement of the award.

We do not agree with contentions of the Union that the Judgment of the Court and the Order of the Board assigning the work are not inconsistent and that both may be allowed to stand.

In this case, the Judgment enforcing the award is vacated and remanded with directions to dissolve the Injunction enforcing the award.