**INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL AND ORNA-MENTAL IRONWORKERS, LOCAL NO. 395, AFL–CIO**

v.

**LAKE COUNTY, INDIANA COUNCIL OF the UNITED BROTHERHOOD OF CARPENTERS, et al.**

**Civ. No. 71 H 242.**

United States District Court, N. D. Indiana, Hammond Division.

Aug. 23, 1972.

Charles Orlove, Chicago, Ill., for plaintiff.

Herbert S. Lasser, Gary, Ind., Kalvin M. Grove, Chicago, Ill., for defendants.

## MEMORANDUM

BEAMER, District Judge.

Plaintiff, International Association of Bridge, Structural and Ornamental Iron Workers, Local No. 395, AFL–CIO (Iron Workers), initiated this action under § 301(a) of the National Labor Relations Act, 29 U.S.C. § 185(a) and § 9 of the Federal Arbitration Act, 9 U.S.C. § 9. The action, based upon breach of contract, requested enforcement of an arbitrator's award concerning a work assignment dispute between plaintiff and defendants Lake County Indiana District Council of the United Brotherhood of Carpenters and Joiners of America, AFL–CIO (Carpenters) and Local Union 41, Laborers International Union of North America, AFL–CIO (Laborers). All three local unions, as well as the international unions with which they are affiliated, are members of the Building and Construction Trades Department. AFL–CIO (Department). The Department's constitution provides that all jurisdictional disputes among members shall be settled according to the plan adopted by the Department.[1] The Department has established such a plan, which provides for a National Joint Board for the Settlement of Jurisdictional Disputes in the Building and Construction Industry (Joint Board). The plan further provides that the Joint Board's decision is binding upon the parties unless appealed.[2]

Defendant Telander Bros. Contractors, Inc. (Telander) is an Illinois corporation engaged in residential, industrial and commercial construction. On April 16, 1971, a dispute arose among the Iron Workers, Carpenters and Laborers as to

1. ARTICLE II. *Objects and Principles.* The objects and principles of this body are: . . . 6. To secure the adjustment of trade and jurisdictional disputes in the building and construction trades industry along practical lines as they may arise from time to time; and such decisions to be final and binding on all affiliated National and International Unions and their affiliated Local Unions.

ARTICLE X. *Jurisdictional Disputes.* All jurisdictional disputes between or among affiliated National and International Unions and their affiliated Local Unions and employers shall be settled and adjusted according to the present plan established by the Building and Construction Trades Department, or any other plan or method of procedure adopted in the future by the Department for the settlement of jurisdictional disputes. Said present plan or any other plan adopted in the future shall be recognized as final and binding upon the Department and upon all affiliated National or International Unions and their affiliated Local Unions.

2. Section 7 provides in part: Any decision or interpretation by the Joint Board shall be immediately accepted and complied with by all parties subject to this Agreement unless an appeal is taken to the Appeals Board.

Telander's assignment of work at a housing project. The matter was referred to the Joint Board on April 21, 1971 and on June 18, 1971 the Joint Board awarded the work to the Iron Workers. The complaint alleged that the Carpenters and the Laborers refused to comply with the Joint Board decision. The Iron Workers further alleged that Telander had entered into a contract with Iron Workers in which Telander agreed to accept as binding any decision or award of the Joint Board as to jurisdictional disputes. The complaint alleged that Telander invoked the Joint Board procedures but later refused to recognize the Joint Board's decision. The Iron Workers requested temporary and permanent injunctive relief, lost wages, punitive damages and costs and expenses incurred during actions brought by Telander in this Court and before the National Labor Relations Board.

Telander, following its award of the work to the Carpenters and Laborers, filed charges against plaintiff with the NLRB on April 26, 1971 and May 3, 1971, alleging a violation of § 8(b)(4) (i), (ii)(D) of the National Labor Relations Act. Subsequently, the Regional Director of the NLRB petitioned for and was granted by this Court a temporary injunction prohibiting plaintiff from engaging in coercive action to force Telander to change its work assignment pending NLRB action on the filed charges. The Regional Director dismissed the charges on July 13, 1971, finding that a voluntary method of adjustment existed with which the charged party had complied, and thus no hearing under § 10(k)[3] of the NLRA was necessary. However, this determination was re-

versed on appeal to the General Counsel of the NLRB, and a § 10(k) hearing was held by the Board in September, October and November of 1971. On April 5, 1972 the Board issued its Decision and Determination of Dispute, 196 NLRB No. 19, awarding the work to Laborers and Carpenters. The charges against plaintiff were dismissed by the Regional Director on April 21, 1972, since plaintiff had notified the Director that it would comply with the Board's decision.

Telander argues that the decision of the NLRB is a final order which disposes of all issues in this case, and that the only avenue of review left open to plaintiff is a refusal to comply with that order, after which the NLRB will issue a complaint and the determination will be reviewable by the courts under the enforcement or review proceedings provided in § 10(e) and § 10(f). In opposition to Telander's motion, the plaintiff Iron Workers contends that it did not agree to comply with the NLRB determination, but merely informed the NLRB that it would refrain from forcing Telander to assign work by means proscribed in § 8(b)(4)(D). Plaintiff further contends that the Board order speaks only to the statutory right of an allegedly impartial employer to resolution of a dispute between contesting unions, and that the Board determination has not resolved issues of breach of contract which are solely for judicial determination. Thus the issue posed by the motion to dismiss is whether the NLRB determination of the work assignment dispute in § 10(k) proceedings precludes a later determination by this Court of damages for breach of contract.

Plaintiff here does not press the moot claim as to its right to an injunction en-

3. Section 10(k), 29 U.S.C. § 160(k), provides: Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(D) of section 158(b) of this title, the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of, the dispute. Upon compliance by the parties to the dispute with the decision of the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed.

forcing the arbitration award by awarding the work. Rather, Iron Workers claim that regardless of the NLRB determination, they are still entitled to contract damages for breach by Telander of its alleged agreement to arbitrate in the first instance, because Telander failed to follow the Joint Board's award. Iron Workers are seeking lost wages and damages for Telander's action in filing charges before the NLRB, thus precipitating a new determination of the dispute, rather than accepting the award of the Joint Board.[4] Telander, of course, alleges numerous deficiencies in both the alleged contract and in the procedures of the Joint Board and does not admit that it was bound by the award. However, since upon a motion to dismiss the facts must be examined in the light most favorable to the plaintiff, these allegations need not be examined.

The precise issue here was posed to the court in Dock Loaders & Unloaders, etc., Local Union No. 854 v. W. L. Richeson & Sons, Inc., 280 F.Supp. 402 (E.D. La.1968). There, the dispute was between the plaintiff and the Teamsters. When the defendant rejected the plaintiff's claim to the disputed work, the plaintiff filed a grievance pursuant to its collective bargaining agreement with the defendant, and the grievance committee awarded the work to the plaintiff Dock Loaders. Plaintiffs later filed an action in the district court under § 301 of the Labor-Management Relations Act of 1947, alleging that the defendant had breached its collective bargaining agreement by assigning the work to the Teamsters. There, as here, the plaintiff sought damages and a preliminary injunction. Thereafter, the employer filed an unfair labor practice charge with the NLRB, a § 10(k) hearing was held, and the Board awarded the work to the Teamsters. There, as here, the plaintiffs no longer asserted their demand

for an injunction ordering defendant to employ their members in the disputed jobs. Even if the issue were not moot here because the work is completed, there would be no right to an injunction because the NLRB award is entitled to precedence over an earlier award. *See* New Orleans Typographical Union No. 17 v. N.L.R.B., 368 F.2d 755, 767 (5th Cir. 1966).

The court in *Dock Loaders* framed the issue as whether the award of the NLRB required the court in an action under § 301 to deny an award of damages accruing prior to the NLRB decision to a union whose members were not assigned disputed jobs, despite a grievance committee award requiring such assignment. In holding that no damages could be awarded, the court quoted Carey v. Westinghouse Electric Corp., 375 U.S. 261, 84 S.Ct. 401, 11 L.Ed.2d 320 (1964):

> Should the Board disagree with the arbiter, by ruling, for example, that the employees involved in the controversy are members of one bargaining unit or another, the Board's ruling would, of course, take precedence; and if the employer's actions had been in accord with that ruling, it would not be liable for damages under § 301. 375 U.S. at 272, 84 S.Ct. at 409.

This language was dicta, since the issue before *Carey* was only whether an agreement to arbitrate could be compelled before the Board had acted. In *Carey*, the IUE and Westinghouse had entered into a collective bargaining agreement which provided that unresolved disputes, including matters of contract interpretation and application, were subject to arbitration. Westinghouse refused to arbitrate a work dispute between IUE and the Federation union. The Court enforced the arbitration agreement on the ground that the controversy might be ended by arbitra-

---

4. Plaintiff requested relief in its complaint consisting of costs and expenses incurred to defend the unfair labor practice charge, the resulting action by the NLRB in this Court for an injunction against Iron-workers (71 H 136) and in Telander's action under § 303 of the Act, (71 H 221), in addition to their claims for enforcement of the Joint Board award and lost wages.

tion. The Court noted that if the controversy were considered to be a work assignment dispute, the Act does not cover all stages of it and does not provide for any method for resolving the dispute absent a strike. A strike or threat of strike gives the Board authority under § 10(k) to resolve the dispute. Thus, the Court refused to assume that the regulatory scheme forced the controversy into the strike stage before a remedy was available. 375 U.S. at 263–264, 84 S.Ct. 401.

The Court emphasized that a suit under § 301 was proper even if a remedy before the Board was available. Normally, when the case reaches the Board and arbitration has already taken place, the Board will defer to the award; however, if the Board disagrees with the arbitrator, the Board award takes precedence. The Court, however, was not directly faced with a conflicting Board decision because none had taken place. The Court in *Dock Loaders,* nevertheless, noted that:

> In the absence of authority to the contrary, or of persuasive reasons for reaching the opposite result, the language of the Supreme Court commands respect. 280 F.Supp. at 405.

The plaintiff argues that such a reading of *Carey* would operate to establish a rule which makes compliance with labor agreements optional with the parties, undermine all methods of voluntary adjustment and would do violence to the policy considerations of the NLRA announced in Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). This argument is taken almost verbatim from the argument presented by counsel in *Dock Loaders* a case which plaintiff's brief does not cite. The court there was unimpressed with this contention. So is this Court. In *Dock Loaders* Judge Rubin reasoned:

> This argument fails to take adequately into account the Congressional policy enunciated in Section 10(k) that

makes the statutory jurisdictional dispute procedure take precedence over contractual arbitration. If the parties were free to race to the forum, one to the arbitrator and the other to the N. L.R.B., there is the counter risk that the party who successfully reached arbitration first would imperil the effectiveness of the statutory remedy by making an employer liable in damages even when his position had been correct under the standards considered appropriate by the N.L.R.B. pursuant to its statutory mandate. National policy indeed encourages arbitration, as *Lincoln Mills* clearly holds. National policy also requires the resolution of jurisdictional disputes under Section 10(k). Full reach cannot be given to both remedies. And it would be inconsistent to subject the party whose cause has prevailed in a final judgment under a statutory procedure to liability for damages occasioned while it was seeking its statutory remedy. 280 F.Supp. at 405.

The court had earlier found that the N. L.R.B. determination was a final decision for purposes of determining whether the defendant's motion was premature. The court reasoned that any other conclusion would have the anomalous result of allowing the losing party in the § 10(k) proceeding to prevent the employer from fully benefiting from that proceeding, because review of the § 10(k) proceeding occurs only if the losing union commits an unfair labor practice. *Id.* at 404.

In the recent case of NLRB v. Plasterers' Local Union 79, 404 U.S. 116, 92 S.Ct. 360, 367, 30 L.Ed.2d 312 (1971), the Supreme Court emphasized that a § 10(k) proceeding and decision, standing alone, binds no one. Its impact is felt in the § 8(b)(4)(D) hearing, because for all practical purposes the award determines who will prevail in an unfair labor practice proceeding. The court stated:

> Neither the employer nor the employees to whom he has assigned the

work are legally bound to observe the § 10(k) decision, but both will lose their § 8(b)(4)(D) protection against the picketing which may, as it did here, shut down the job.

However, the Court noted that the practical result of the § 10(k) proceeding is that the union to whom work is assigned may strike the employer without fear of an 8(b)(4)(D) violation. Thus, the employer will be under intense pressure practically to conform to the decision. *Id.* Moreover, the Court emphasized that it had "no quarrel with the view that § 10(k) is designed to decide which union is entitled to the work." *Id.* at 369. Further, the Court noted that "[a] § 10(k) hearing is a comparative proceeding aimed at determining which union is entitled to perform certain tasks." *Id.* at 371.

■ Since the Board, as part of its § 10(k) determination, decided which union was entitled to the work as well as prohibiting plaintiff from using unlawful methods to achieve a favorable work assignment, the voluntary compliance of plaintiff with the NLRB determination must be considered a renunciation of its claim to the work. Thus, the § 10(k) decision became a final decision as a result of plaintiff's compliance with it.

■ The Supreme Court has emphasized that § 10(k) of the Act represents a belief by Congress that it is more important to industrial peace that jurisdictional disputes be settled permanently than it is that unfair labor practice sanctions be imposed, and the words "hear and determine the dispute" in § 10(k) convey the idea of deciding a controversy. Thus, in N.L.R.B. v. Radio and Television Broadcast Engineers Union, Local 1212, I.B.E.W., 364 U.S. 573, 81 S.Ct. 330, 5 L.Ed.2d 302 (1961) the court held it was the duty of the Board to decide jurisdictional disputes on their merits and that the responsibility for compulsory determination of the dispute, following the determination that no voluntary method existed, rested entirely on the Board. The Court went on to state:

> The Board also contends that respondent's interpretation of § 10(k) should be avoided because that interpretation completely vitiates the purpose of Congress to encourage the private settlement of jurisdictional disputes. This contention proceeds on the assumption that the parties to a dispute will have no incentive to reach a private settlement if they are permitted to adhere to their respective views until the matter is brought before the Board and then given the same opportunity to prevail which they would have had in a private settlement . . . . We find it unnecessary to resolve this controversy for it turns upon the sort of policy determination that must be regarded as implicitly settled by Congress when it chose to enact § 10(k). Even if Congress has chosen the wrong way to accomplish its aim, that choice is binding both upon the Board and upon this Court.

Although the Court there expressly refused to consider the effect of a decision of the Board under § 10(k) upon a suit for damages under the Labor Management Relations Act, the above considerations are compelling here. The policy to be applied in enforcing grievance arbitration provisions in collective agreements is the policy reflected in our national labor laws to promote industrial stabilization through the collective bargaining agreement. United Steel Workers of America v. Warrier and Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). The enforcement of arbitration agreements has been predicated on the view that the parties have voluntarily bound themselves to such a mechanism. *Plasterers, supra,* 92 S.Ct. at 370. Congress has by § 301 assigned courts the duty of determining whether a promise to arbitrate has been breached, and the judicial inquiry is confined to whether the reluctant party agreed to arbitrate. *Warrier*

*and Gulf, supra.* However, the policy behind § 301 is to "promote a higher degree of responsibility upon the parties to such agreements, and will thereby promote industrial peace." S.Rep. No. 105, 80th Cong., 1st Sess. 17. Congress sought to place sanctions behind these agreements because they were the preferred method of settling disputes. *See* Drake Bakeries, Inc. v. Local 50, American Bakery & Confectionery Workers, 370 U.S. 254, 82 S.Ct. 1346, 8 L.Ed.2d 474 (1962). They are not the only method. It is for the Board in a § 10(k) hearing to determine whether the facts submitted are satisfactory evidence that the parties have agreed upon a method for the voluntary adjustment of the dispute. *See* Local 450, I.U.O.E. v. Elliott, 256 F.2d 630, 636 (5th Cir. 1958).

■ Once the Board has decided that no voluntary method of solving the dispute exists, that decision is entitled to respect. To subject the prevailing party to a suit for damages would erode the national policy of finally settling the dispute. As the Court stated in John Wiley & Sons v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964) in the context of whether the court or an arbitrator is the appropriate body to decide whether procedural prerequisites which condition the duty to arbitrate have been met:

> Doubt whether grievance procedures or some part of them apply to a particular dispute, whether such procedures have been followed or excused, or whether the unexcused failure to follow them avoids the duty to arbitrate cannot ordinarily be answered without consideration of the merits of the dispute which is presented for arbitration. . . . It would be a curious rule which required that intertwined issues of "substance" and "procedure" growing out of a single dispute and raising the same ques-

tions on the same facts had to be carved up between two different forums, one deciding after the other. Neither logic nor considerations of policy compel such a result.

■ Although *Wiley* concerned the relationship of the courts to arbitrators, its policy is equally applicable here. The questions which were decided in the Board proceeding included those which the Joint Board decided. The Board decided that the Joint Board decision was not binding on the employer and the determination of whether the arbitrator's award should finally prevail should be considered settled by the NLRB decision. Insofar as the arbitration agreement attempted to preclude by contract the filing of an unfair labor practice charge, it is contrary to federal law and unenforceable. Lodge 743, I.A.M. v. United Aircraft Corp., 220 F.Supp. 19 (D.Conn.1963), aff'd 337 F.2d 5 (2d Cir. 1964), cert. denied 380 U.S. 908, 85 S.Ct. 893, 13 L.Ed.2d 797 (1965).

The union in this case was not forced to submit to the determination of the matter by the Board rather than by arbitration. If the union had merely enforced the arbitration award by means of either of the two provisions it now invokes for jurisdiction, the employer would have had no recourse to the NLRB. But the union used a strike to obtain its goal, and thus the policies set forth in *New Orleans, supra,* are applicable here:

> We are of the opinion, of course, that once the [Board] Determination is made and becomes final, then it takes precedence over the § 301 arbitration proceedings. When the Union struck to enforce the work assignment it removed the controversy from the field of private contractual rights into the higher ambit of public rights. When the Board acted, its order was entitled to precedence. Congress definitely in-

tended that a § 10(k) determination should be a permanent settlement of the dispute. . . . The judgment of the Court under § 301 must yield to the final Determination of the Board. 368 F.2d at 767.

Further, the Court does not feel that this result will, as plaintiff contends, undermine the ·voluntary resolution of jurisdictional disputes nor make such agreements optional with the parties for another reason. Under § 10(k), the Board does not determine the dispute if the parties, within 10 days after notice has been given to them that a charge has been filed, submit to the Board satisfactory evidence that they have adjusted or agreed upon methods for the voluntary adjustment of the dispute. Here the Board found no such evidence; plaintiff need not have consented to the Board's determination under § 10(k) if dissatisfied with it, and the award was reviewable in the course of review of any subsequent final order under § 8(b)(4)(D). *See* Henderson v. I.L.W.U. Local 50, 457 F.2d 572 (9th Cir. 1972). The § 10(k) proceeding is the final adjudication of the dispute. Although it is only an interlocutory order, it is reviewable in the course of review of any subsequent final order under § 8(b)(4)(D). *Id.* Upon review of that order, the Court of Appeals could have decided whether the refusal to defer to the award was an abuse of discretion.

Defendants Laborers and Carpenters have also filed motions to dismiss the action, based upon the alleged failure of plaintiff to exhaust local administrative procedures set up by regional councils established by the Department's Constitution. Plaintiff responds that these provisions, if they exist, are superseded by the constitution of the Department. It is unnecessary for the Court to consider these allegations in view of the disposition of Telander's motion to dismiss. For the reasons stated above, the motions of the Laborers and Carpenters must also be granted.