619 F.2d 580
 104 L.R.R.M. (BNA) 2050, 88 Lab.Cas. P 12,006
 INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS (UAW) AND ITS LOCAL
1519, Plaintiffs-Appellants,
v.
ROCKWELL INTERNATIONAL CORPORATION, Defendant-Appellee,
and
National Labor Relations Board, Intervenor-Appellee.
 No. 78-1059.
 United States Court of Appeals,
Sixth Circuit.
 Argued Feb. 6, 1980.
Decided April 10, 1980.
 
 John A. Fillion, Gen. Counsel, U. A. W., Ralph O. Jones, Detroit, Mich., for plaintiffs-appellants.
 Thomas P. Hustoles, James E. Tobin, Miller, Canfield, Paddock & Stone, Detroit, Mich., Elliott Moore, Aileen Armstrong, Deputy Associate Gen. Counsel, Richard B. Bader, N. L. R. B., Washington, D. C., Bernard Gottfried, Director, Region 7, N. L. R. B., Detroit, Mich., for defendant-appellee.
 Before KEITH and JONES, Circuit Judges, and PHILLIPS, Senior Circuit Judge.
 HARRY PHILLIPS, Senior Circuit Judge.
 
 
 1
 This appeal presents the question as to which of two conflicting decisions in a labor dispute shall prevail: (1) the award of an arbitrator granting certain work to employees represented by the United Automobile Workers (UAW) or (2) the subsequent determination of the National Labor Relations Board that the employer should assign the same work to employees represented by the Teamsters union. District Judge Charles W. Joiner granted the Labor Board's motion for summary judgment, holding that the NLRB decision took precedence over the award of the arbitrator. The UAW appeals. We affirm.
 
 
 2
 * Rockwell International Corporation (Rockwell) is a multi-facility employer engaged in electronic and aerospace industries at locations throughout the nation including several in Southern California. This dispute arose over trucking work done in Southern California.
 
 
 3
 Since 1949 Rockwell has operated a testing facility in the Santa Susana mountains, which is shared by the company's Rocketdyne and Atomics International Divisions, both of which are located approximately twelve miles away, in Canoga Park. Rockwell's traffic department, located at Rocketdyne, is responsible for the movement of goods and people between the Canoga Park division and Santa Susana. Its drivers make six scheduled runs daily from Rocketdyne to Atomics International to Santa Susana and back, loading and unloading at each station, and also make unscheduled runs when necessary. The Santa Susana facility has no over-the-road equipment of its own.
 
 
 4
 Beginning with the activation of the Santa Susana facility in 1949, trucking operations into and out of that facility have been performed by employees in the traffic department who are represented by the Teamsters union.
 
 
 5
 In November 1974, the UAW and Rockwell renewed a 1968 collective bargaining agreement covering UAW employees at Rockwell's Santa Susana facility. The agreement covered work assignments to be performed at Santa Susana and provided a grievance arbitration procedure to settle work assignment disputes. In 1974, a dispute arose over who should perform the over-the-road truck driving work which originated at Santa Susana. As stated above, most of this work in the past had been performed by employees of the Rockwell facility represented by the Teamsters union. The Teamsters also had a collective bargaining agreement with Rockwell.
 
 
 6
 The UAW filed a grievance which went to arbitration. On March 30, 1976, the arbitrator awarded all over-the-road driving which originated from Santa Susana to employees represented by the UAW. The Teamsters were not a party to this proceeding.
 
 
 7
 In April 1976, the Teamsters union informed Rockwell that it refused to recognize the award to the UAW and would picket Rockwell facilities to prevent the assignment of over-the-road driving to employees represented by UAW.
 
 
 8
 On May 21, 1976, the UAW filed suit in the United States District Court for the Eastern District of Michigan, pursuant to the Labor Management Relations Act (LMRA) § 301, 29 U.S.C. § 185, seeking to enjoin Rockwell's breach of contract caused by its refusal to honor the arbitration award, an order to enforce the arbitration award requiring Rockwell to implement the award, and "any and all other relief as this Court deems necessary and proper."
 
 
 9
 On May 24, 1976, Rockwell filed an unfair labor practice charge with the NLRB premised on the Teamsters' picketing threat in violation of LMRA § 8(b)(4)(D), 29 U.S.C. § 158(b)(4)(D).[1]
 
 
 10
 In June 1976, the NLRB conducted a hearing pursuant to LMRA § 10(k), 29 U.S.C. § 160(k).[2] Subsequent to the hearing but prior to the determination, the NLRB moved to intervene in the district court and stay the UAW's suit pending the determination in the § 10(k) proceeding. Prior to argument on the motion, the NLRB issued its § 10(k) decision holding that Teamster represented employees should do the disputed over-the-road driving originating at the Santa Susana facility. In the § 10(k) hearing, Rockwell contended that the merits of the dispute favored awarding the work to the Teamsters, citing its assignment of the disputed work and its preference, its past practice, efficiency and economy of operations, collective bargaining agreements and Board certifications, relative skills and UAW acquiescence. The UAW contended that a § 10(k) proceeding was inappropriate because there was no threat of proscribed activities by the Teamsters since its collective bargaining agreement contained a no-strike clause, the Teamsters' letter threatening picketing was a sham to circumvent the arbitration award, and the Board should defer to the arbitration decision affecting the UAW and Rockwell.
 
 
 11
 Subsequent to the NLRB's § 10(k) determination, the UAW moved the district court for partial summary judgment seeking to enforce the arbitration award in its favor, to enjoin Rockwell from continuing to breach the collective bargaining agreement and to declare Rockwell liable for damages resulting from its breach of the collective bargaining agreement with the UAW.
 
 
 12
 The NLRB renewed its motion to intervene and to dismiss the complaint, or in the alternative, to grant summary judgment denying enforcement of the arbitrator's award. The district court, confronting the issue of whether an arbitrator's award granting certain work to the UAW should be enforced despite a subsequent ruling by the Board in a section 10(k) proceeding, 29 U.S.C. § 160(k), awarding the work to another union, determined that the § 10(k) determination must be treated as final for the purpose of establishing its precedence over the arbitrator's award and granted the NLRB's motion for summary judgment. The court further held that when an employer has been acting in accord with an ultimate ruling of the NLRB in a § 10(k) proceeding, it is not liable for damages to the union.
 
 II
 
 13
 The key issue in this appeal is whether the arbitrator's award granting the over-the-road driving work to the UAW represented employees should be enforced despite a subsequent NLRB ruling in a § 10(k) proceeding awarding that work to Teamster represented employees. We agree with District Judge Joiner that it should not.
 
 
 14
 The NLRB has express statutory authority to settle work assignment disputes. NLRB v. Radio & Television Broadcast Engineers Union, Local 1212, 364 U.S. 573, 81 S.Ct. 330, 5 L.Ed.2d 302 (1961). 29 U.S.C. § 158(b)(4)(D) makes it an unfair labor practice for a labor organization to threaten, coerce or restrain any employer for the purpose of forcing the employer to assign particular work to members of one union at the expense of another's members. 29 U.S.C. § 160(k) specifically states that whenever a person has engaged in a § 158(b)(4) (D) unfair labor practice, the NLRB is directed to determine the dispute.
 
 
 15
 29 U.S.C. § 160(k) states only one instance in which the NLRB is directed to defer to an arbitrator's award: when the Board has satisfactory evidence that the parties have adjusted or agreed upon methods for the voluntary adjustment of the dispute. "(S)ection 10(k) offers strong inducements to quarrelling unions to settle their differences by directing dismissal of unfair labor practice charges upon voluntary adjustment of jurisdictional disputes." 364 U.S. at 577, 81 S.Ct. at 333. In the present case, the Teamsters and the UAW have not attempted to settle their differences through a voluntary adjustment of the dispute. The arbitration proceedings between the UAW and Rockwell did not include the Teamsters union as a party.
 
 
 16
 Once the NLRB decides a work assignment dispute, its determination takes precedence over a contrary arbitrator's award. Carey v. Westinghouse Corp., 375 U.S. 261, 84 S.Ct. 401, 11 L.Ed.2d 320 (1964); NLRB v. Radio & Television Broadcast Engineers, supra; New Orleans Typographical Union No. 17 v. NLRB, 368 F.2d 755 (5th Cir. 1966). This is true regardless of which action was initiated first. Dock Loaders and Unloaders, ILA Local No. 854 v. Richeson & Sons, Inc., 280 F.Supp. 402 (E.D.La.1968). In Carey, the Court specifically noted that where a NLRB determination and an arbitrator's award conflict, the former's ruling would take precedence. Further, "(t)he superior authority of the Board may be invoked at any time." 375 U.S. at 272, 84 S.Ct. at 409. Accord, New Orleans Typographical, supra.
 
 
 17
 In Radio & Television Broadcast Engineers, the Court analyzed the Board's power pursuant to § 10(k) as follows:
 
 
 18
 As one of the forerunners to these very provisions of the Act, President Truman told the Congress in 1947 that disputes "involving the question of which labor union is entitled to perform a particular task" should be settled, and that if the "rival unions are unable to settle such disputes themselves, provision must be made for peaceful and binding determination of the issues."[19] And the House Committee report on one of the proposals out of which these sections came recognized the necessity of enacting legislation to protect employers from being "the helpless victims of quarrels that do not concern them at all."[20]
 
 
 19
 The Taft-Hartley Act as originally offered contained only a section making jurisdictional strikes an unfair labor practice. Section 10(k) came into the measure as the result of an amendment offered by Senator Morse which, in its original form, proposed to supplement this blanket proscription by empowering and directing the Board either "to hear and determine the dispute out of which such unfair labor practice shall have arisen or to appoint an arbitrator to hear and determine such dispute . . . ."[21] That the purpose of this amendment was to set up machinery by which the underlying jurisdictional dispute would be settled is clear and, indeed, even the Board concedes this much. The authority to appoint an arbitrator passed the Senate[22] but was eliminated in conference,[23] leaving it to the Board alone "to hear and determine" the underlying jurisdictional dispute. The Board's position is that this change can be interpreted as an indication that Congress decided against providing for the compulsory determination of jurisdictional disputes. We find this argument unpersuasive, to say the very least. The obvious effect of this change was simply to place the responsibility for compulsory determination of the dispute entirely on the Board, not to eliminate the requirement that there be such a compulsory determination. The Board's view of its powers thus has no more support in the history of § 10(k) than it has in the language of that section. Both show that the section was designed to provide precisely what the Board has disclaimed the power to provide an effective compulsory method of getting rid of what were deemed to be the bad consequences of jurisdictional disputes.
 
 
 20
 364 U.S. at 580-82, 81 S.Ct. at 335.
 
 
 21
 In responding to a challenge based on the federal labor policy of encouraging private settlements of jurisdictional disputes, the Court said:
 
 
 22
 The Board also contends that respondent's interpretation of § 10(k) should be avoided because that interpretation completely vitiates the purpose of Congress to encourage the private settlement of jurisdictional disputes. This contention proceeds on the assumption that the parties to a dispute will have no incentive to reach a private settlement if they are permitted to adhere to their respective views until the matter is brought before the Board and then given the same opportunity to prevail which they would have had in a private settlement. Respondent disagrees with this contention and attacks the Board's assumption. We find it unnecessary to resolve this controversy for it turns upon the sort of policy determination that must be regarded as implicitly settled by Congress when it chose to enact § 10(k). Even if Congress has chosen the wrong way to accomplish its aim, that choice is binding both upon the Board and upon this Court. 364 U.S. at 583, 81 S.Ct. at 336.
 
 
 23
 Both the legislative history of the LMRA and the case law on this issue support a finding that a NLRB § 10(k) determination is to take priority over a contrary arbitrator's award in the dispute.
 
 
 24
 The practicalities of the matter also support this conclusion. The UAW asserts that the Board's § 10(k) determination should not be treated as final because it needs the approval of the Court of Appeals to be enforceable. The court noted in Dock Loaders, Local 854, supra, 280 F.Supp. at 404:
 
 
 25
 The defendant asserts, and the plaintiffs concede, that the N.L.R.B. determination of the work assignment dispute is a final decision for purposes of determining whether the defendant's motion is premature. The Court agrees. Any other conclusion would lead to the anomalous result of allowing the losing party in the 10(k) proceeding to prevent the employer from reaping the full benefit of that proceeding, since review of the 10(k) decision can be had only if the losing union commits an unfair labor practice an event entirely within the control of the losing union. (Footnote omitted.)
 
 III
 
 26
 Having determined that the Board's § 10(k) determination has priority over a conflicting arbitrator's award, we now turn to the issue of damages.
 
 
 27
 In the district court the UAW sought a declaration that Rockwell was liable for damages for breaching the collective bargaining agreement. In holding that Rockwell was not liable for such damages, the district court noted that: (1) rather than request damages in its complaint, the UAW first sought them in its motion for summary judgment, and (2) in the labor relations field, public policy considerations are present which do not exist in the field of private contract law, and the public policy considerations control the award of damages in the facts at bar. We agree with the district court's holding that when an employer has been acting in accord with an ultimate NLRB § 10(k) ruling, it is not liable for damages to the disappointed union.
 
 
 28
 This issue was presented squarely and resolved in Dock Loaders, Local 854, supra. There, the district court relied on dictum from Carey which "suggests that an action for damages . . . is barred":
 
 
 29
 "Should the Board disagree with the arbiter by ruling, for example, that the employees involved in the controversy are members of one bargaining unit or another, the Board's ruling would, of course, take precedence; and if the employer's actions had been in accord with that ruling, it would not be liable for damages under § 301." 375 U.S. at 272, 84 S.Ct. at 409. 280 F.Supp. at 405.
 
 The district court stated:
 
 30
 Plaintiffs have cited no authorities reaching a result contrary to that suggested by the Supreme Court. However, they have argued that:
 
 
 31
 "To read Carey as (holding that the N.L.R.B.'s decision precludes a suit for damages sustained "prior to the work award") would operate to establish a rule which makes compliance with labor agreements optional with the parties and does violence to the policy considerations of the Act as announced in Lincoln Mills (Textile Workers v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972) and the established jurisprudence thereunder."
 
 
 32
 This argument fails to take adequately into account the Congressional policy enunciated in Section 10(k) that makes the statutory jurisdictional dispute procedure take precedence over contractual arbitration. If the parties were free to race to the forum, one to the arbitrator and the other to N.L.R.B., there is the counter risk that the party who successfully reached arbitration first would imperil the effectiveness of the statutory remedy by making an employer liable in damages even when his position had been correct under the standards considered appropriate by the N.L.R.B. pursuant to its statutory mandate. National policy indeed encourages arbitration, as Lincoln Mills clearly holds. National policy also requires the resolution of jurisdictional disputes under Section 10(k). Full reach cannot be given to both remedies. And it would be inconsistent to subject the party whose cause has prevailed in a final judgment under a statutory procedure to liability for damages occasioned while it was seeking its statutory remedy. Therefore, in the light of Carey, I must conclude that damages may not be recovered here. Id.
 
 
 33
 See also, Local 7-210, Oil & Chemical Workers v. Union Tank Car Co., 475 F.2d 194 (7th Cir.), cert. denied, 414 U.S. 875, 94 S.Ct. 68, 38 L.Ed.2d 120 (1973).
 
 
 34
 We agree with the analysis of Dock Loaders, Local 854, and the holding of District Judge Joiner that an employer who has been acting in accord with the NLRB's order in a § 10(k) proceeding is not liable to the disappointed union for damages in a LMRA § 301 suit.
 
 
 35
 The judgment of the district court is affirmed. No costs are taxed.
 
 
 
 [1]
 (b) It shall be an unfair labor practice for a labor organization or its agents
 (4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is
 (D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work:
 
 
 [2]
 (k) Hearings on jurisdictional strikes. Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(D) of section 8(b) (29 USCS § 158(b)(4)(D)), the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of the dispute. Upon compliance by the parties to the dispute with the decision of the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed
 
 
 [19]
 93 Cong.Rec. 136
 
 
 [20]
 HR.Rep.No.245, 80th Cong., 1st Sess., p. 23, I Legislative History of the Labor Management Relations Act, 1947, at 314 (hereinafter cited as Leg.Hist.). (That inartfully drawn collective bargaining agreements made it possible for both the UAW and the Teamsters to claim the disputed work does not vitiate the federal labor policy of finally and permanently settling labor disputes which affect interstate commerce.)
 
 
 [21]
 The amendment was contained in a bill (S.858) offered by Senator Morse, which also contained a number of other proposals. 93 Cong.Rec. 1913, II Leg.Hist. 987
 
 
 [22]
 I Leg.Hist. 241, 258-259. See also the Senate Committee Report on the bill, S.Rep.No.105, 80th Cong., 1st Sess., p. 8, I Leg.Hist. 414
 
 
 [23]
 H.R.Conf.Rep.No.510, 80th Cong., 1st Sess., p. 57, I Leg.Hist. 561