HUTTER CONSTRUCTION CO.,
Petitioner–Appellant,

and

Wisconsin Laborers District Council
and Laborers Local Union No.
1086, Intervenors–Petitioners–Appellants,

v.

INTERNATIONAL UNION OF OPER-
ATING ENGINEERS, LOCAL 139,
AFL–CIO, Respondent–Appellee.

Nos. 87–2051, 87–2083.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 12, 1988.

Decided Nov. 16, 1988.

Thomas W. Scrivner, Michael Best & Friedrich, Milwaukee, Wis., for petitioner-appellant.

Walter F. Kelly, Sutton & Kelly, Milwaukee, Wis., for intervenors-petitioners-appellants.

Judith E. Kuhn, Perry First Lerner Quindel & Kuhn, S.C., Milwaukee, Wis., for respondent-appellee.

Before WOOD, Jr., FLAUM and KANNE, Circuit Judges.

FLAUM, Circuit Judge.

Petitioners Hutter Construction Company ("Hutter") and Wisconsin Laborers District Council and Laborers Local Union No. 1086 ("Laborers") appeal from the district court's grant of summary judgment in favor of respondent, the International Union of Operating Engineers Local 139 ("Operators"). The district court affirmed an arbitrator's decision awarding the Operators damages for Hutter's breach of a subcontracting provision in a collective bargaining agreement.[1] We affirm.

## I.

In July 1984, the state of Wisconsin awarded Hutter, a general construction contractor, the contract to build a medium security prison in Oshkosh, Wisconsin. At the time, Hutter, through its membership in the Associated General Contractors of America, was a party to a collective bargaining agreement ("Area II Agreement") with the Operators, a union representing mason-tending forklift workers.[2] The Area II Agreement granted the Operators the exclusive right to operate forklift trucks on construction projects throughout most of Wisconsin.[3] In addition, the Area II Agreement stipulated that bargaining unit work could only be subcontracted to a signatory to the Agreement.[4] The Agreement generally provided for bipartite arbitration of disputes arising under the contract and gave arbitrators wide discretion in fashioning remedies for violations.[5] The Agreement, however, mandated tri-partite arbitration of "jurisdictional disputes."[6]

Shortly after receiving the Oshkosh prison contract, Hutter subcontracted the masonry work on the project to Bill Dentinger Inc. ("BDI"). BDI was not a signatory to the Area II agreement but was a party to a collective bargaining agreement with the Laborers, a union that also represented mason-tending forklift workers.[7] Acting pursuant to this contract and in conformity with its longstanding practice, BDI assigned the forklift work on the project to the Laborers.

The Operators, however, refused to accept this result. In August 1984, David Waite, the Operators' business representative, entered into negotiations with both Hutter and BDI in an effort to have the Laborers removed from the project. After these negotiations proved unsuccessful, the

---

1. The Laborers, though not a party to the relevant arbitration hearing, were granted leave to intervene by the district court.

2. Hutter was also a party to a similar collective bargaining agreement with the Laborers. The practice of entering into conflicting collective bargaining agreements is very common in the construction industry.

3. Section 8.8 of the Area II Agreement provided: The operation of elevator or forklift trucks on construction job-sites (excluding warehouse and storage yards as per Teamster Operating Engineers International Agreement) is exclusively the craft work of the Operating Engineers, and assignment of said operation shall be made to an Operating Engineer, dispatched and covered by the terms and conditions of this Agreement.
The Area II Agreement covered all of Wisconsin except for six counties in the Milwaukee area. These counties were covered by another collective bargaining agreement known as the Area I Agreement.

4. Section 4.1 of the Area II Agreement provided, in pertinent part:

The Contractor agrees that, when subletting or contracting out work covered by this Agreement ... he will sublet or contract out such work only to a subcontractor who has signed, or is otherwise bound by, a written labor agreement entered into with the Union.

5. Section 9.2 of the Agreement provided, in pertinent part:

In the event the arbitrator finds a violation of the Agreement, he shall have the authority to award backpay to aggrieved person or persons ... in addition to whatever other or further remedy may be appropriate.

6. Section 9.2 of the Agreement defined a jurisdictional dispute as "a dispute between unions over the assignment of work and in which the employer has interest."

7. The Laborers and Operators were fierce rivals for mason-tending forklift work on construction projects. This rivalry has resulted in substantial litigation before the NLRB. *See, Laborers Local 1359,* 264 N.L.R.B. 1397 (1982); *Laborers Local 317,* 274 N.L.R.B. 145 (1985); *Laborers Local 1359,* 281 N.L.R.B. 140 (1986).

Operators filed a grievance with Hutter, alleging that Hutter had violated the Area II Agreement by subcontracting the masonry work to BDI.

The Operators' grievance was eventually submitted to bi-partite arbitration. In July 1985, the arbitrator, after finding that the dispute between Hutter and the Operators was not jurisdictional, ruled in favor of the Operators and ordered Hutter to provide backpay to individual members of the Operators who were prevented from working on the project by Hutter's subcontract to BDI. The arbitrator stipulated that this award would continue until the forklift work ceased or was assigned to members of the Operators. In October 1985, the Operators filed suit in the district court to enforce the award.

Hutter responded to the adverse arbitration award by asking BDI to replace members of the Laborers with members of the Operators. The Laborers, faced with the possibility of being replaced on the prison project, informed BDI that it would take legal and economic action against the subcontractor to protect its status. This threat prompted BDI to file a § 8(b)(4)(D) unfair labor practice charge against the Laborers with the NLRB.[8]

In November 1985, the Laborers staged a one day work stoppage at the construction site. This action prompted Hutter to file its own § 8(b)(4)(D) unfair labor practice charge against the union. BDI, however, continued to use members of the Laborers on the project until its completion in June 1986.

The NLRB consolidated the two charges against the Laborers into a single § 10(k) proceeding[9] and issued its decision in January 1987. After analyzing various factors including employer preference, contractual obligations and efficiency of performance, the Board ruled that the Laborers had the superior claim to the forklift work. Accordingly, the Board dismissed the unfair labor practice charges against the Laborers. In June 1987, the district judge granted summary judgment in favor of the Operators on its claim to enforce the arbitrator's award and denied petitioners' motion to vacate the judgment.

## II.

Petitioners' principal argument on appeal is that the district court erred in affirming the arbitrator's decision that the Operators' subcontracting grievance was not a jurisdictional dispute. Petitioners claim that the subcontracting grievance was a disguised jurisdictional dispute and make alternative arguments based on this premise. First, petitioners contend that the NLRB resolved the jurisdictional dispute at the § 10(k) hearing by awarding the forklift work on the project to the Laborers. Alternatively, petitioners contend that the subcontracting grievance was a jurisdictional dispute within the meaning of the Area II Agreement; that the arbitrator lacked authority under the Agreement to resolve a jurisdictional dispute at a bipartite arbitration proceeding; and that consistent with the Agreement, the grievance should be referred to tripartite arbitration.

Ordinarily, reviewing courts accord substantial deference to an arbitrator's award. *E.I. DuPont de Nemours v. Grasselli Employees Independent Association,* 790 F.2d 611, 614 (7th Cir.) *cert. denied,* 479 U.S. 853, 107 S.Ct. 186, 93 L.Ed.2d 120 (1986). This standard helps to prevent a "judicialization" of the arbitration process. *Ethyl Corp. v. United Steelworkers,* 768 F.2d 180, 184 (7th Cir.1985) *cert. denied,*

8. Section 8(b)(4)(D) of the National Labor Relations Act prohibits labor organizations from employing threats or work stoppages in order to obtain work claimed by another labor organization.

9. A § 10(k) proceeding is a hearing conducted by the NLRB pursuant to § 10(k) of the National Labor Relations Act. In order to conduct a § 10(k) hearing, the Board must find that there is reasonable cause to believe that a § 8(b)(4)(D) violation has occurred. Once the Board determines that there is reasonable cause to believe that a violation has occurred, it conducts a hearing to determine which labor organization is entitled to the disputed work. If the Board determines that the group charged with the § 8(b)(4)(D) violation had the superior claim to the work, it will dismiss the unfair labor practice charge.

475 U.S. 1010, 106 S.Ct. 1184, 89 L.Ed.2d 300 (1986). Determining the character of the Operators' claim, however, necessarily determines the arbitrability of the dispute, and is, therefore, undeniably an issue for judicial determination. *AT & T Technologies Inc. v. Communications Workers*, 475 U.S. 643, 649, 106 S.Ct. 1415, 1418, 89 L.Ed. 2d 648 (1986). Thus, in reaching our decision, we must independently evaluate all the evidence, and give no deference to the arbitrator's findings.

A jurisdictional dispute is "a dispute between two or more groups of employees over which is entitled to do certain work for an employer." *Labor Relations Board v. Radio Engineers*, 364 U.S. 573, 579, 81 S.Ct. 330, 334, 5 L.Ed.2d 302 (1961). Although this definition is helpful in some contexts, the distinction between jurisdictional and non-jurisdictional claims is often a matter of semantics. Thus, jurisdictional disputes are sometimes disguised as other types of controversies such as work preservation disputes. *See Lumber Workers Local 2592*, 268 NLRB 126 (1983).

■ We recognize that the jurisdictional/non-jurisdictional dichotomy presents a close question in this case. We conclude, however, that the Operators' subcontracting grievance was a distinct non-jurisdictional claim separable from the jurisdictional issue decided by the NLRB. In doing so, we also find that the subcontracting grievance was properly resolved through bi-partite arbitration.

Our decision that the Operators' subcontracting grievance is a non-jurisdictional claim rests on two considerations. First, the Operators' grievance against Hutter arose independently of BDI's assignment of the work to the Laborers, the event that triggered the NLRB hearing;[10] the grievance arose at the moment that Hutter contracted with BDI. In fact, the validity of the Operators' grievance against Hutter is not dependent upon the identity of the party that ultimately performed the forklift work. Thus, the Operators would have had a legitimate grievance against Hutter even if BDI eventually signed the Area II Agreement and assigned the forklift work to the Operators.[11] Conversely, the Operators would not have had a legitimate grievance against Hutter if Hutter had subcontracted the masonry work to a signatory to the Area II Agreement who awarded the forklift work to the Laborers.[12]

Second, characterizing the Operators' subcontracting grievance as a jurisdictional dispute would produce an unfair result under the terms of the Area II Agreement. The Area II Agreement clearly contemplates the award of backpay to remedy the breach of the subcontracting provision.[13] In contrast, the Agreement essentially precludes the award of backpay in jurisdictional disputes.[14] In this case, Hutter clearly breached the subcontracting provision,[15] yet, by characterizing the dispute as jurisdictional, would succeed in avoiding the agreed upon penalty for its conduct. We

**10.** This fact refutes petitioners' argument that the arbitrator had to evaluate other relevant collective bargaining agreements in order to determine that Hutter breached the subcontracting provision in the Area II Agreement.

**11.** In this situation, of course, the Operators would only be entitled to nominal damages.

**12.** In this situation the Operators' grievance would be against the subcontractor and would be based on the exclusivity clause in the Area II Agreement.

**13.** The Area II Agreement essentially consists of two parts which may be termed the jurisdictional and non-jurisdictional sections. Article VII, the jurisdictional section, is a self-contained entity that features its own remedial provision. Section 9.2, the backpay provision applies to all

provisions not within Article VII. The subcontracting provision is contained in Article IV.

**14.** Under Section 7.9 of the Area II Agreement, the arbitrator of a jurisdictional dispute may only award backpay if the dispute is substantially similar to a previous dispute decided by the arbitrator and the employer ignored the arbitrator's prior decision.

**15.** In its brief, Hutter argues that it had no control over the circumstances that caused the breach. We find no merit to this contention. The "circumstances" that created the breach was Hutter's decision to subcontract the masonry work to BDI, not BDI's assignment to the Laborers, as Hutter claims. Hutter had complete control over the decision to subcontract the work to BDI.

refuse to ratify this unjust result. The Operators are entitled to the benefit of their collective bargaining agreement. If Hutter believes that the penalty for breach of the subcontracting provision is too harsh, it should attempt to modify the Area II Agreement. Hutter, however, may not employ subtle verbal distinctions to avoid the consequences of its conduct under the present Area II Agreement.

In sum, we conclude that the Operators' subcontracting grievance was a non-jurisdictional claim that was separable from the jurisdictional issue decided by the NLRB. In doing so, we also find that the arbitrator had the authority to resolve the grievance at a bi-partite arbitration proceeding under the Area II Agreement.

### III.

■ Having determined that the Operators' subcontracting grievance was properly resolved through bi-partite arbitration, we must next decide whether the arbitrator's backpay award actually conflicts with the NLRB decision awarding the forklift work to the Laborers. When an arbitration award conflicts with an NLRB decision, the NLRB decision takes precedence. *Carey v. Westinghouse,* 375 U.S. 261, 272, 84 S.Ct. 401, 409, 11 L.Ed.2d 320 (1964) (dicta); *Local 7–210, Oil, Chemical and Atomic Workers v. Union Tank Car Co.,* 475 F.2d 194 (7th Cir.), *cert. denied* 414 U.S. 875, 94 S.Ct. 68, 38 L.Ed.2d 120 (1973); *New Orleans Typographical Union No. 17 v. NLRB,* 368 F.2d 755 (5th Cir.1966).

■ We conclude that the arbitrator's and NLRB's awards are consistent remedies that reflect the divergent issues addressed in the respective proceedings.[16] At

the § 10(k) hearing, the Board ruled that based on a number of *non-contractual* factors, the Laborers had the *superior* claim to the forklift work. The critical issue is whether the arbitrator, by awarding backpay to the Operators, necessarily determined that they had the superior claim to the forklift work. We believe that he did not.[17]

The essential distinction in this case is the distinction between a legitimate "contractual" claim and a superior "overall"[18] claim. The Area II Agreement explicitly authorized the arbitrator to award backpay for violations of its provisions. To find such a violation, the arbitrator had to determine that the aggrieved party had a *legitimate contractual* claim against the contractor. To establish the *legitimacy* of the Operators' subcontracting grievance against Hutter, the arbitrator had to find that the forklift work was covered by the Area II Agreement and that Hutter subcontracted the work to a non-signatory to the Agreement. The arbitrator found that these two conditions were present, and thus, necessarily determined that the Operators had a legitimate contractual claim against Hutter that entitled them to backpay under the Area II Agreement.

The NLRB's task and frame of reference at the § 10(k) hearing was far different from the arbitrator's. The Board had to determine the relative merit of the Operators' claim to the forklift work when compared with the claims of another union, not the merits of the Operators' claim against Hutter. In reaching its decision, the Board analyzed a variety of contractual and non-contractual factors. Initially, the Board had to determine whether both unions had

---

**16.** We recognize that Hutter will now pay two unions for work that was performed by one. This unfortunate result, however, is solely attributable to Hutter's decision to enter into conflicting collective bargaining agreements.

**17.** Our conclusion necessarily disposes of petitioners' claim that the Operators' effort to enforce the arbitrator's award constitutes coercive conduct. Attempting to enforce an arbitrator's award is only coercive when the award conflicts with an NLRB decision. *See International Longshoremen's and Warehousemen's Union, Local 32 v. Pacific Maritime Association,* 773 F.2d

1012 (9th Cir.1985), *cert. denied* 476 U.S. 1158, 106 S.Ct. 2277, 90 L.Ed.2d 720 (1986).

We note that the NLRB has recently concluded that the losing party in a § 10(k) proceeding may continue to pursue a subcontracting grievance in arbitration and may receive *monetary* damages if successful. *See Local Union 33,* 289 N.L.R.B. No. 167 (1988).

**18.** For purposes of this discussion, an "overall" claim is a claim based on both contractual and non-contractual considerations.

legitimate contractual claims to the work. To conclude that both unions had legitimate contractual claims, the Board had to find that the forklift work was within the work jurisdiction of both unions based on the respective collective bargaining agreements.[19] The Board, in fact, like the arbitrator, found that the forklift work was within the Operators' work jurisdiction, but concluded that based on a number of non-contractual factors, the Operators were not entitled to the work.

In sum, the arbitrator and the NLRB rendered consistent awards in this case. The arbitrator determined that the Operators had a *legitimate contractual* claim to the work and awarded damages based on this fact. The NLRB also determined that the Operators had a legitimate contractual claim to the forklift work, but, unlike the arbitrator, could not base its ultimate decision on this fact. Thus, the arbitrator's backpay award was not a determination that the Operators had the superior "overall" claim to the forklift work; the backpay award simply reflected the arbitrator's determination that the Operators had a legitimate contractual claim to the work, a determination that was also made in a different context by the NLRB.[20]

### IV.

We conclude that the Operators' subcontracting grievance against Hutter was a non-jurisdictional claim that was properly resolved through bi-partite arbitration. In addition, we find that the arbitrator's backpay award does not conflict with the NLRB's decision awarding the forklift work to the Laborers. Accordingly, the

19. The Board, unlike the arbitrator, did not have to determine that BDI was a nonsignatory to the Area II Agreement.

20. Petitioners also contend that the Operators disavowed any claim to the forklift work in a September 1984 letter to Hutter, BDI and the NLRB and are therefore precluded from enforcing the arbitrator's award. In this circuit, the rule is that an unequivocal disclaimer of any *claim* to the work precludes a party from enforcing an arbitration award based on that claim. *Pepper Construction Company v. International Union of Operating Engineers Local 150*, 749 F.2d 1242 (7th Cir.1984).

district court's decision affirming the arbitrator's award is AFFIRMED.

In August, 1984, BDI filed a § 8(b)(4)(D) charge against the Operators with the NLRB alleging that David Waite, the Operators' president, made improper threats in an effort to obtain the forklift work for his union. In response, the Operators sent a letter to Hutter, BDI and the NLRB disavowing the use of threats to engage in work stoppages. This letter prompted the NLRB to dismiss the § 8(b)(4)(D) charge against the Operators. The letter, however, did not disavow any *claim* to the forklift work.