In the

# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 03-3090 & 03-3104

ADVANCE CAST STONE COMPANY,

*Plaintiff-Appellee,*

*v.*

BRIDGE, STRUCTURAL AND REINFORCING
IRON WORKERS, LOCAL UNION NO. 1,

*Defendant-Appellant.*

———————

Appeals from the United States District Court for
the Northern District of Illinois, Eastern Division.
Nos. 01 C 2748 & 01 C 3892—**Rebecca R. Pallmeyer**, *Judge.*

———————

ARGUED FEBRUARY 24, 2004—DECIDED JULY 22, 2004

———————

Before POSNER, RIPPLE and EVANS, *Circuit Judges.*

RIPPLE, *Circuit Judge.* On April 18, 2001, Advance Cast
Stone Company ("ACS") filed a complaint seeking to vacate
an arbitration award issued against it and in favor of Bridge,
Structural and Reinforcing Iron Workers, Local Union No.
1 ("Iron Workers Local No. 1" or "the Iron Workers"). *See* 29
U.S.C. § 185. On September 30, 2002, the district court
entered a judgment affirming the arbitration award. On

October 11, 2002, ACS filed a motion to alter or amend the judgment. *See* Fed. R. Civ. P. 59(e). On July 8, 2003, the district court granted ACS' motion, reversed its earlier affirmance of the arbitration award and entered a judgment in favor of ACS. The Iron Workers timely appealed. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

# I

## BACKGROUND

### A. Facts

#### 1. Collective bargaining history

ACS engages in the manufacture, delivery and installation of architectural precast concrete and other products used in construction. ACS has worked with two unions that are relevant to this appeal. The principal union that performs work for ACS is the Mason Contractors Association of Greater Chicago and Illinois District Council No. 1 of the International Union of Bricklayers and Allied Craftsmen ("Bricklayers"). ACS has been bound by a series of collective bargaining agreements with the Bricklayers since the late 1970s.

ACS also has had occasion to engage members of the Iron Workers Local No. 1 to work on its projects. Iron Workers Local No. 1 bargains with the Associated Steel Erectors of Chicago, Illinois ("Association") for employees performing iron work in certain counties. The Iron Workers entered into a series of collective bargaining agreements with the Association, commonly known as the "Principal Agreement." ACS is not a member of the Association; however, in 1982, ACS signed identical compliance agreements with the Iron

Workers. According to the compliance agreements, ACS agreed to be bound to the Principal Agreement.

On November 25, 1996, ACS submitted to the Iron Workers written notice of termination, and, effective 1997, the compliance agreements were terminated. After that time, ACS was no longer bound to the terms of the Principal Agreement, nor did ACS enter any other agreement with the Iron Workers. ACS' President, Matt Garni, testified that he preferred to use Bricklayers because they are better able to handle the work and because the Iron Workers' wage and benefits costs are higher than the Bricklayers' costs.

After the Principal Agreement was terminated in 1997, ACS began to do a number of projects in the Chicago area, the Iron Workers' territory. In July or August of 1998, ACS began working on the "Block 120" Project. Originally, ACS' crew consisted only of Bricklayers; however, after some Iron Workers working for other subcontractors threatened to walk off the job, ACS entered into a "Short Form Agreement" with the Iron Workers. In this agreement, dated August 6, 1998, ACS agreed, among other matters, to make certain payments to the Iron Workers' trust funds. The Short Form Agreement, unlike the previous compliance agreements, did not refer specifically to or incorporate the Principal Agreement. After the Short Form Agreement was executed, ACS completed the Block 120 Project with a composite crew of Bricklayers and Iron Workers. ACS subsequently agreed to apply the Short Form Agreement to two other projects—"Cathedral Place" and "Rush Garage"—in late 1998 and early 1999.

Between August 1998 and the end of 1999, ACS worked on ten additional projects within the Iron Workers' territory; in nine of the ten projects, a Bricklayers-only crew was used without protest from the Iron Workers.

## 2.  The Goodman Theatre Project and the Joint Arbitration Board Award

In 2000, ACS worked on a number of other projects in the Iron Workers' territory with Bricklayers-only crews; the Iron Workers did not protest. In August or September of 2000, however, ACS began working on the "Goodman Theatre" Project. It began the job with an all-Bricklayers crew, but the Iron Workers threatened to picket in protest. This action prompted ACS to file an unfair labor practice charge with the National Labor Relations Board ("NLRB"). ACS contended that the Iron Workers' picketing threat violated § 8(b)(4)(D) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(b)(4)(D), and it sought a hearing under § 10(k) of the NLRA, *id.* § 160(k).[1] However, the Iron Workers notified the NLRB that it was disclaiming interest in the work, and, accordingly, the NLRB dismissed the unfair labor practice charge.

Despite disclaiming this work, on or about November 21, 2000, the Iron Workers submitted a Grievance Dispute/ Demand for Arbitration with the Joint Arbitration Board ("JAB"), an arbitration body created under the Iron Workers' Principal Agreement to resolve disputes. The Iron Workers' Grievance alleged: (1) ACS' course of conduct bound it to the Principal Agreement,[2] and (2) ACS violated the Principal

---

[1]  "A § 10(k) proceeding is a hearing conducted by the NLRB subsequent to a § 8(b)(4)(ii)(D) claim to determine which union has the superior claim to 'work in dispute.'" *Miron Constr. Co., Inc. v. Int'l Union of Operating Eng'rs, Local 139*, 44 F.3d 558, 561 n.11 (7th Cir. 1995).

[2]  "It is 'well established that a collective bargaining agreement is not dependent on the reduction to writing of the parties' intention to be bound,' *Capitol-Husting Co., Inc. v. NLRB*, 671 F.2d
(continued...)

Agreement by refusing to employ members of Iron Workers Local No. 1 at the Goodman Theatre Project. The "course of conduct" to which the grievance referred included actions taken by ACS after signing the Short Form Agreement that were consistent with the Principal Agreement but not specifically required by the Short Form Agreement. For example, the Iron Workers alleged that, since the execution of the Short Form Agreement, ACS had provided certificates of insurance, did not cancel a wage and fringe benefit bond until February 12, 2001, and had complied with union audits. All these actions were in compliance with, and pursuant to, the terms of the Principal Agreement.

On January 18, 2001, the JAB held a hearing. ACS argued that the JAB lacked jurisdiction over ACS because ACS was not a signatory to or otherwise bound by the Principal Agreement. The JAB disagreed and concluded that, since August 6, 1998 (when ACS signed the Short Form Agreement), ACS had been bound by the Iron Workers' Principal Agreement. Accordingly, held the JAB, it had jurisdiction over the dispute. The JAB also found that ACS had violated the Principal Agreement by refusing to hire Iron Workers at the Goodman Theatre site and other unspecified job sites. As a remedy, the JAB ordered ACS to submit to a payroll audit under the terms of the Principal Agreement and to pay wages and benefits due for any work that should have been assigned to Iron Workers since August 6, 1998.

On April 18, 2001, ACS filed an action in district court that sought vacation of that award. ACS again took the position

---

[2] (...continued)
237, 243 (7th Cir. 1982), rather '[a]ll that is required is conduct manifesting an intention to abide and be bound by the terms of an agreement.' *Id.*" *Gariup v. Birchler Ceiling & Interior Co., Inc.*, 777 F.2d 370, 373 (7th Cir. 1985).

that it was not bound by the Principal Agreement, and, accordingly, that the JAB lacked jurisdiction. As will be described more fully below, the district court rendered its first decision on September 30, 2002, in which it confirmed the arbitration award. However, at the time it rendered that decision, the district court was unaware that the same parties were litigating the issue in a § 10(k) proceeding before the NLRB, and, indeed, that the NLRB had handed down its § 10(k) determination just days earlier. The action that prompted the proceeding, and the NLRB's determination therein, are described below.

### 3. The Deerfield Project and the NLRB's § 10(k) Determination

Around May of 2001, ACS began working on the "Nine Parkway" or "Deerfield" Project with a Bricklayers-only crew. The Iron Workers picketed. Its members carried signs claiming "Breach of Contract." On May 8, 2001, ACS filed an unfair labor practice charge against Iron Workers Local No. 1, alleging that it was violating § 8(b)(4)(D) of the NLRA, 29 U.S.C. § 158(b)(4)(D), by engaging in proscribed activity with an object of forcing ACS to assign the work at the Deerfield Project to it rather than to Bricklayers. ACS' claim under § 8(b)(4)(D) triggered a § 10(k) investigation and ultimately a § 10(k) proceeding before the NLRB.[3] On September 26, 2002, just four days before the district court entered its decision affirming the JAB's award, the NLRB

---

[3] *See* 29 C.F.R. § 101.31 ("The investigation of a jurisdictional dispute under section 10(k) is initiated by the filing of a charge, as described in § 101.2, by any person alleging a violation of paragraph (4)(D) of section 8(b)."); *id.* § 101.35 (explaining the procedures for a § 10(k) hearing before the NLRB).

issued its § 10(k) determination. The NLRB noted that, in order for it to be able to proceed with a determination of a dispute under § 10(k), it had to find, inter alia, "that the parties ha[d] not agreed on a method for voluntary adjustment of the dispute." R.12, Attachment at 3. On this issue, the NLRB held:

> [W]e find there is no agreed-upon voluntary mechanism for resolving this dispute. Thus, the Employer is not a signatory to the Iron Workers' Principal Agreement or to any agreement containing such a mechanism. The project-only agreement the Employer signed with respect to Block 120 [the Short Form Agreement] makes no reference to the Principal Agreement and neither do the Employer's letters consenting to use of composite crews at the Cathedral Place and Rush Garage Construction sites. The Employer is not a signatory to *any* agreement between the Iron Workers International and the Bricklayers International Unions, and clearly not to an agreement that requires the use of composite bricklayer and iron worker crews for the work in issue or the submission of disputes to the joint boards. Therefore, none of the agreements cited by the Iron Workers are binding on the Employer. Moreover, the project-only agreements that the Employer operated under in the face of picketing, threats to picket, or joint board decisions are devoid of reference to mechanisms for the resolution of jurisdictional disputes, and therefore, cannot bind the Employer to JCB or JAB processes.

*Id.* at 4 (citation omitted). In a footnote, the NLRB further noted:

> The Iron Workers argues that the Employer is bound by the Principal Agreement under the JAB's award. We find no merit in that contention. The award fails to state the basis for the JAB's finding that the Employer is

bound to the Principal Agreement even though it is not signatory to that agreement or to any other agreement implicating it. *See, e.g., Operating Eng'rs Local 318 (Kenneth F. Foesie Masonry)*, 322 NLRB 709, 714 (1996) (declining to give weight to arbitrator's decision lacking rationale).

*Id.* at 3 n.8.

On the merits of the § 10(k) jurisdictional dispute, the NLRB concluded that the Bricklayers were entitled to perform the work in dispute. The NLRB explained that,

[a]lthough various Iron Workers documents arguably cover work of the type in issue, the Employer terminated its collective-bargaining agreement with Iron Workers effective May 31, 1997. With the exception of the project-only agreements discussed above, which do not obligate the Employer at any other sites, the Employer is not signatory to *or bound by* any collective bargaining agreement with the Iron Workers.

*Id.* at 4 (emphasis added). Finally, the NLRB noted that, although it usually limits the scope of its award to the matter that gave rise to the § 10(k) controversy, because of the history of disputes between the parties and the likelihood of disputes in the future, it was appropriate to issue a blanket, prospective order. In this order, the NLRB held that the work at issue (the Deerfield Dispute) and *all* of ACS' work within the Iron Workers' jurisdiction belonged to Bricklayers.

## B. District Court Proceedings

### 1. September 30, 2002 Decision

After a bench trial, the district court issued its first opinion on September 30, 2002. The district court began by noting

that "[t]he central question in this case is whether Advance Cast Stone was bound to the Principal Agreement at any time after August 6, 1998," the date the Short Form Agreement was executed. R.23 at 10. If it was, then, under the Principal Agreement, the dispute regarding the Goodman Theatre Project was properly before the JAB, and the JAB's award would not be vacated.[4] The district court explained that, under this circuit's case law, an employer may adopt a collective bargaining agreement by its actions or a course of conduct that demonstrates an intent to be bound, even if the employer has not signed that agreement. The court held that, although the evidence was close, ACS did bind itself to the Principal Agreement "and therefore rendered it suscep-tible to the jurisdiction of the JAB on January 18, 2001." *Id.* at 14.

### 2. July 8, 2003 Decision

On October 11, 2002, ACS filed a motion to alter or amend the judgment pursuant to Federal Rule of Civil Procedure 59(e). In its motion, ACS argued that the NLRB's ruling of September 26, 2002, undermined the decision of the JAB and therefore required the district court to reconsider its deci-sion affirming the JAB's award. The district court agreed, and, on July 8, 2003, it entered judgment in favor of ACS.

In its July 8, 2003 decision, the court began with the settled proposition in this circuit that "an NLRB decision issued pursuant to a § 10(k) proceeding overrides a conflict-

---

[4] ACS did not and does not dispute that, if it was bound by the Principal Agreement, it violated the Principal Agreement by fail-ing to give work to Iron Workers on the Goodman Theatre Project and the other projects within the Iron Workers' territory.

ing decision by an arbitrator." R.31 at 6. The court then explained that the JAB's award and the NLRB's § 10(k) determination conflicted. *See id.* at 9 ("[T]he JAB found that ACS was bound to the Principal Agreement; the NLRB found that it was not, and specifically noted that the JAB had no jurisdiction over ACS. Although the JAB did not directly address the Deerfield Project, the NLRB's order makes clear that ACS was not bound by the Principal Agreement to use Iron Workers at that site, either."). Because the court found the JAB's award in conflict with the NLRB's § 10(k) determination, and because the law compels that, in this situation, the NLRB's determination takes precedence, the district court reversed its prior decision and held that the JAB was without jurisdiction and its award must be vacated.

## II

## DISCUSSION

"When an arbitration award is in conflict with the decision of the NLRB in a § 10(k) proceeding, the NLRB decision takes precedence." *Miron Constr. Co., Inc. v. Int'l Union of Operating Eng'rs, Local 139*, 44 F.3d 558, 564 (7th Cir. 1995); *see also Chauffers & Helpers Local Union No. 50 v. McCartin-McAuliffe Mech. Contractor, Inc.*, 708 F.2d 313, 315 (7th Cir. 1983) ("[A] Board decision pursuant to a Section 10(k) hearing takes precedence over an inconsistent arbitral decision."). This principle flows from *Carey v. Westinghouse Electric Corp.*, 375 U.S. 261, 272 (1964) ("Should the Board disagree with the arbiter . . . the Board's ruling would, of course, take precedence; and if the employer's action had been in accord with that ruling, it would not be liable for damages under § 301."), and has been adopted by other circuits, *see, e.g., J.F. White Contracting Co. v. Local 103 Int'l*

*Bhd. of Elec. Workers*, 890 F.2d 528, 529 (1st Cir. 1989) ("[C]ourts are not to enforce an arbitration award that conflicts with a § 10(k) determination.").

The Iron Workers do not dispute this settled principle but attempt to explain why it should not control the outcome of this case. The Iron Workers' arguments are legal ones, and we therefore review them de novo. *See Slaney v. The Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 592 (7th Cir. 2001) (explaining that, in reviewing a district court's affirmation or vacation of an arbitrator's award, this court reviews legal questions de novo and factual questions for abuse of discretion). After considering the Iron Workers' submissions, we must agree with the district court that the principle controls the outcome of this case: The § 10(k) determination is in conflict with the arbitration award and, therefore, trumps that award. Therefore, we affirm the district court's July 8, 2003 decision vacating the arbitrator's award.

First, the Iron Workers detail at great length that, both before and after the NLRB's § 10(k) decision, the district court had jurisdiction over the vacation action under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185. This proposition is unquestionable, but it does not advance the Iron Workers' cause. When "a case involves both the interpretation of a collective bargaining agreement under Section 301 of the [LMRA] and allegations of violations of the NLRA, the federal district court and NLRB have concurrent jurisdiction." *Mkt. Serv. Ass'n v. Produce, Fresh & Frozen Fruits, & Vegetables, Fish, Butter, Eggs, Cheese, Poultry, Florist, Nursery Landscape & Allied Employees Union, Local 703*, 875 F. Supp. 474, 477 (N.D. Ill. 1994). The district court had "jurisdiction"—the statutory authority to determine whether ACS was bound by the Principal Agreement (and the implications that flow from that determination). What we must resolve is how, in exercising that jurisdiction, the

court should have factored the conflicting § 10(k) determi-
nation into its decision-making process.[5]

The Iron Workers next argue that the JAB's determination
is not in conflict with the NLRB's § 10(k) determination;
thus, the principle that "courts are not to enforce an arbi-
tration award that conflicts with a § 10(k) determination" is
not triggered. *J.F. White Contracting*, 890 F.2d at 529. The
Iron Workers note that the decisions technically involved

---

[5] The Iron Workers also contend that the NLRB's § 10(k) decision
is not binding or controlling in this case because a § 10(k)
proceeding is not "final." The Iron Workers' argument emphasizes
that a § 10(k) proceeding is not the final resolution of whether
a union violated § 8(b)(4)(D). A final determination that the stat-
ute has been violated is reached only after the aggrieved union
refuses to abide by the § 10(k) decision and then fails to prevail
in the resulting unfair labor practice proceeding. *See NLRB v.
Plasterers' Local Union 79*, 404 U.S. 116, 122 n.10 (1972); *see also* 29
C.F.R. § 101.36.

Although a § 10(k) decision is not a final determination that the
union violated § 8(b)(4)(D), it certainly is controlling for purposes
of deciding its effect on and relationship to an arbitrator's award,
at least when the aggrieved union—here, the Iron Workers— agrees
to comply with the § 10(k) determination. *See, e.g., UAW Local
1519 v. Rockwell Int'l Corp.*, 619 F.2d 580, 584 (6th Cir. 1980)
(explaining that a § 10(k) decision should be treated as "final"
and controlling because a contrary conclusion would lead to the
"anomalous result of allowing the losing party in the 10(k) pro-
ceeding to prevent the employer from reaping the full benefit of
that proceeding, since review of the 10(k) decision can be had
only if the losing union commits an unfair labor practice, an event
entirely within the control of the losing union"); *Int'l Ass'n of
Bridge, Structural & Ornamental Iron Workers Local No. 395 v. Lake
County, Ind. Council of the United Bhd. of Carpenters*, 347 F. Supp.
1377, 1378 (N.D. Ind. 1972) ("Thus, the § 10(k) decision became a
final decision as a result of plaintiff's compliance with it.").

different work. The JAB was presented with the Goodman Theatre Project and, by virtue of its damages award, addressed projects between August 6, 1998 (when the Short Form Agreement was signed), and January 18, 2001 (when the JAB issued its award). The NLRB's order addressed the Nine Parkway or Deerfield Project, which took place in May 2001, and, by virtue of its area-wide prospective order, future work. Therefore, the Iron Workers Local No. 1 argues, there is no conflict and no reason why it should be precluded from seeking redress through its § 301 contractual remedy.

We believe that the district court was on solid ground in not taking such a limited view of the NLRB's § 10(k) determination. The NLRB's § 10(k) decision addressed the entire dispute, including the projects encompassed in the JAB's award. The NLRB discussed the history of the parties' dispute, including the Goodman Theatre Project, and, in the end, issued an area-wide order that ACS was not bound to employ members of the Iron Workers. In issuing such a broad ruling, the NLRB explicitly departed from its normal path of considering only the "particular controversy that gave rise to the 10(k) proceeding." R.12, Attachment at 6. It took this unusual step because "work of the kind in dispute has been a continuous source of controversy" and because the Iron Workers had a "history of [engaging in] conduct that arguably violates Section 8(b)(4)." *Id.* In so holding, the § 10(k) determination clearly contemplated that, throughout the years of dispute among ACS, the Iron Workers and Bricklayers, ACS was not bound by the Principal Agreement. *See also* R.12, Attachment at 4 ("Although various Iron Workers documents arguably cover work of the type in issue, the Employer terminated its collective-bargaining agreement with Iron Workers effective May 31, 1997. With the exception of the project-only agreements discussed above, which do not obligate the Employer at any other sites, the Employer is not signatory to or bound by any

collective bargaining agreement."). Because the NLRB's determination disagreed with the JAB on the question of whether ACS was bound to the Principal Agreement, it also necessarily disagreed with the JAB on whether the JAB had jurisdiction (because the JAB had jurisdiction *only* through the Principal Agreement), whether the Iron Workers or Bricklayers were entitled to the disputed work covered by the JAB award (because Iron Workers were entitled to the work *only* under the Principal Agreement), and, thus, whether ACS should be liable for damages for refusing to assign that work to Iron Workers.

The Iron Workers also urge that, based on our case law, the awards should not be considered irreconcilable. They point to our decisions in *Hutter Construction Co. v. International Union of Operating Engineers, Local 139*, 862 F.2d 641 (7th Cir. 1988), and *Miron Construction Co., Inc. v. International Union of Operating Engineers, Local 139*, 44 F.3d 558 (7th Cir. 1995), as examples of cases in which we held that an arbitration award to one union under a subcontracting clause was not inconsistent with a § 10(k) determination by the NLRB to award work to a different union.

We believe *Hutter* and *Miron* are distinguishable from the present case. First, as noted above, both *Hutter* and *Miron* were premised on the unique subcontracting context in which they arose. *See, e.g., Miron Constr.*, 44 F.3d at 567 ("An arbitrator's award of backpay to one union *in a subcontracting dispute* is not inconsistent with the NLRB's prior award of the work to a different union in a § 10(k) proceeding." (emphasis added)). Additionally, in *Miron*, we explicitly distinguished situations—such as we face here—in which "[t]he employer . . . was responsible both for the work assignment and for the breach of certain terms of the union's collective bargaining agreement." *Id.* at 566.

Second, those cases—because they arose in the context of subcontracting disputes—did not involve a direct conflict between the arbitrator's and the NLRB's awards and thus did not implicate the general principle that the NLRB's § 10(k) determination takes precedence over an arbitrator's award. For example, we explained in *Hutter* that "[t]he critical issue [wa]s whether the arbitrator, by awarding back-pay to Operators, *necessarily determined* that they had the superior claim to forklift work"—the determination made by the NLRB. *Hutter Constr.*, 862 F.2d at 645 (emphasis added). We held the arbitration award did not reach that ultimate issue because the arbitrator's award was limited to interpreting contractual terms whereas the NLRB's award was based on extra-contractual considerations. *See id.* at 646; *accord Miron Constr.*, 44 F.3d at 565. In this case, by contrast, there simply is no way to reconcile the JAB's and NLRB's decisions: The JAB determined that ACS was bound by the Principal Agreement to assign work to the Iron Workers; the NLRB determined that ACS was not at any time relevant to this appeal bound by the Principal Agreement, and, accordingly, all work present and future belongs to the Bricklayers. In this context, we believe that the principle that an arbitrator's award must give way to a conflicting § 10(k) determination by the NLRB is fully operative.

The Iron Workers finally argue that the NLRB's § 10(k) decision was not in conflict with the JAB's or district court's decision because the NLRB's reasoning "focused only" on whether ACS was a *signatory* to the Iron Workers' Principal Agreement (or another Iron Workers' agreement) and did not focus on whether ACS was bound by its course of conduct. Appellant's Br. at 25. The § 10(k) determination, however, explained that, "[w]ith the exception of the project-only agreements discussed above, which do not obligate the Employer at any other sites, the Employer is not signatory to *or bound by* any collective bargaining agreement with the

Iron Workers." R.12, Attachment at 4 (emphasis added). The
NLRB is obviously aware that an employer can commit
itself to an agreement by its course of conduct, *see Bi-County
Wholesale Beverage Distribs. Labor Ass'n,* 291 N.L.R.B. 466, 469
(1988) (finding course of conduct bound parties to agree-
ment); its decision, fairly read, simply did not find such a
course of conduct here. In any event, the correctness of the
NLRB's methodology in its § 10(k) determination and of its
underlying rationale are not properly before us. *See J.F.
White Contracting,* 890 F.2d at 529-30 (refusing to consider
two arguments "that, in effect, attack the validity of the
Board's § 10(k) decision" because "it is well established that
N.L.R.B. determinations under section 10(k) are not directly
reviewable in this or any other court" (internal quotation
marks and citations omitted)). For our present purposes, the
only question is whether the NLRB's ultimate decision
conflicts with the arbitrator's award. As we have demon-
strated, there is such a conflict and, therefore, the arbitra-
tor's award may not be enforced by the district court. *Id.* at
529 ("It is well-established law that courts are not to enforce
an arbitration award that conflicts with a § 10(k) determina-
tion.").[6]

---

[6] The Iron Workers also claim that the § 10(k) determination is
not binding because the NLRB conducted its determination of
whether ACS was bound by the Principal Agreement under less
stringent standards. The Iron Workers submit that the NLRB's
decision on the inapplicability of the Principal Agreement was
arrived at in its preliminary findings on the applicability of the
statute, and not in its decision on the merits of the dispute. On
the basis of our own scrutiny of the NLRB's opinion, we cannot
accept this submission. *See* R.12, Attachment at 4 (noting in the
merits analysis that "the Employer is not signatory to or bound
                                                    (continued...)

## Conclusion

For the foregoing reasons, we affirm the district court's decision to vacate the JAB's award.

AFFIRMED

A true Copy:

---

[6] (...continued)
by any collective bargaining agreement").

In any event, the Iron Workers' argument is without merit. To determine whether the statute is applicable and thus whether a dispute for work is properly before it, the NLRB must find: "[1] there are competing claims for work, [2] that there is reasonable cause to believe that § 8(b)(4)(D) has been violated, and [3] that the parties have not agreed on a method for voluntary adjustment of the dispute." *Id.* at 3; *see also Miron Constr.*, 44 F.3d at 561 n.11. In *Miron*, this court refused to give weight to a finding "designed to meet the Board's decidedly low threshold requirement that it find reasonable cause to believe that § 8(b)(4)(D) has been violated." *Miron Constr.*, 44 F.3d at 564-65. The Iron Workers suggest that the NLRB also operates under an "decidedly low threshold" in determining "[3] that the parties have not agreed on a method for voluntary adjustment of the dispute"; therefore, as in *Miron*, a court is not bound to give that finding preference if it conflicts with an arbitrator's award. *Miron*, however, addressed a different prong of the test to determine whether § 10(k) applies: whether there is "*reasonable cause to believe* § 8(b)(4)(D) has been violated." The difference is significant. The NLRB does not attempt to decide whether there is "*reasonable cause to believe* the parties have not agreed upon a method for voluntary adjustment of the dispute," but whether the parties have, in fact, made such an agreement. This inquiry requires the NLRB to consider in plenary fashion whether the parties bound themselves to an agreement that contains a voluntary dispute mechanism. Accordingly, the Iron Workers' argument is unavailing.

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

USCA-02-C-0072—7-22-04